**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,**

v.

**TRANS WORLD AIRLINES, INC., Defendant.**

**No. 79 Civ. 4276 (JMC).**

United States District Court, S. D. New York.

Aug. 13, 1982.

James R. Neely, Jr., Chicago, Ill., and Virginia Waters, New York City (Jean L. Schmidt and Brunhilda Sanders, of counsel), for plaintiff.

Kilpatrick & Cody, Atlanta, Ga., and Washington, D. C. (William H. Boice, Atlanta, Ga., and Joseph W. Dorn, Atlanta, Ga., and Washington, D. C., of counsel), for defendant.

## OPINION

CANNELLA, District Judge.

After a nonjury trial on the merits of plaintiff's complaint, the Court finds for defendant. The complaint is dismissed.

## BACKGROUND

Plaintiff Equal Employment Opportunity Commission ["EEOC"] commenced this action on August 15, 1979, pursuant to 29 U.S.C. §§ 217, 626(b), alleging that defendant Trans World Airlines, Inc. ["TWA"] had continuously engaged in unlawful employment practices since June 12, 1968, in violation of section 4(a) of the Age Discrimination in Employment Act ["ADEA"], 29 U.S.C. § 623(a). At trial, however, plaintiff narrowed the scope of its allegations to the following claims: (1) a "pattern or practice" of discrimination arising from the reorganization of defendant's Cargo Staff department in New York City in August 1976, and (2) discrete acts of discrimination in terminating or refusing to promote, transfer or reassign six employees because of their age.

On the third day of trial, the Court granted defendant's motion to dismiss those claims relating to the August 1976 Cargo Staff department reorganization on the ground that they were barred by the applicable statute of limitations, 29 U.S.C. § 255.[1] What remained were plaintiff's claims that TWA unlawfully denied promotions and/or reassignments to James A. Rooney, Maxwell McFall, John F. Murphy and Roger Cutrufello, and terminated George B. Kujawski and Vito A. Angerame. Plaintiff claims that all six employees are entitled to back pay.

Defendant contends it did not discriminate against the six employees on the basis of age. Moreover, defendant argues that plaintiff's evidence failed to establish a prima facie case of age discrimination with respect to many of the contested employment decisions, and that all the other contested decisions were made for legitimate, nondiscriminatory reasons.

Defendant is an employer engaged in an industry affecting commerce within the meaning of 29 U.S.C. § 630(b), (g), (h). Plaintiff conciliated all claims now pending in accordance with 29 U.S.C. § 626(b). The Court has jurisdiction pursuant to 28 U.S.C. §§ 451, 1345.

## FACTS

*James A. Rooney*

James A. Rooney, born September 6, 1927, joined TWA in 1951 as a Transportation Agent in Chicago. He was promoted to his first management position in 1956 as a Station Supervisor, and promoted again in 1960 to Supervisor, Ticketing Procedures in Kansas City. In 1964, he became Regional Manager, Passenger and Cargo Services at

---

1. Transcript of Trial at 1–11 [hereinafter "Tr."]. Although the Court indicated it would file a Memorandum setting forth in greater detail its reasoning on this issue, *id.* at 2, the Court has decided that its oral opinion, as read into the record, will suffice. The Court reaffirms its conclusion that the Supreme Court's decision in *Delaware State College v. Ricks*, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980), is controlling, especially in light of the Court's subsequent decision in *Chardon v. Fernandez*, 454 U.S. 6, 102 S.Ct. 28, 70 L.Ed.2d 6 (1981) (per curiam). *See also Allen v. United States Steel Corp.*, 665 F.2d 689, 692–93 (5th Cir. 1982); *Aronsen v. Crown Zellerbach*, 662 F.2d 584, 593 (9th Cir. 1981).

John F. Kennedy International Airport ["JFK"] in New York City. In 1968, at the age of 40, he was promoted again to Supervisor, Cargo Reservation Services. In the latter position, he supervised a department of approximately six persons which monitored TWA's system-wide cargo activity on a daily basis. In 1969, Rooney joined TWA's Cargo Staff department at company headquarters in Manhattan as Manager, Cargo Charter Sales. In 1971, he became Manager, Freight Customer Services, and in 1974 he was promoted to Manager, Freight Regulations and Claims Prevention. Rooney then assumed the position of Manager, Freight Regulations and Procedures in January 1976, but in August 1976, he was demoted to Analyst, Central Cargo Control in Kansas City as a result of the Cargo Staff reorganization. At the time of trial, Rooney held the latter position.[2]

Rooney testified that he obtained extensive customer service and supervisory experience as Station Supervisor in Chicago from 1956 to 1960, Supervisor, Ticketing Procedures in Kansas City from 1960 to 1964, Regional Manager, Passenger and Cargo Services at JFK from 1964 to 1968, and Supervisor, Cargo Reservation Services at JFK from 1968 to 1969.[3] Rooney acknowledged, however, that the last time he held a customer service position at an air-port was 1960 as a Station Supervisor in Chicago.[4]

Rooney also testified that he had extensive cargo sales experience as Manager, Cargo Charter Sales in New York between 1969 and 1971.[5] The latter was not a field position, although Rooney claimed he assisted field personnel in making sales and occasionally made direct sales to customers in the field.[6] In addition, Rooney testified that he had finance experience. He stated, however, that this experience was of a personal nature gained in private real estate and stock transactions.[7]

Rooney testified that he gained experience with ticket sales when he worked as a Transportation Agent and Station Supervisor in Chicago from 1951 to 1960.[8] He also said that between 1960 and 1964, as Supervisor, Ticketing Procedures in Kansas City, he was responsible for devising the ticketing procedures for the entire TWA system.[9] He admitted, however, that his familiarity with city ticket offices, as opposed to airport ticket facilities, was limited to his transactions as a customer of TWA.[10]

Gene Ossler, who worked for TWA in various capacities from 1952 to 1976,[11] testified that he had had business dealings with Rooney on numerous occasions during his TWA career.[12] He stated that Rooney performed his duties as a Supervisor of Ticketing Procedures in Kansas City in an aver-

---

2. Plaintiff's Exhibits 84, 85 [hereinafter plaintiff's exhibits will be referred to as "PX___" and defendant's exhibits will be referred to as "DX___"].

3. Tr. at 591–98.

4. Tr. at 639.

5. Tr. at 598–600.

6. Tr. at 600.

7. Tr. at 646–47. Rooney testified:
 Q Did you have any finance experience?
 A Yes.
 Q What is your finance experience?
 A Private finance experience. I was—
 Q What's your private finance experience?
 A I engaged in real estate activities and transactions, and I bought and sold houses, and I made money at this, and I discovered long before it became common that you buy low-priced housing with great leverage when you take over a G.I. loan shortly after its infancy, you have tied up money that isn't yours but it's thoroughly guaranteed and you've got a market for those houses, and you can rent them and eventually you're going to have not only 30 to 40 percent return on your money, but somebody else has bought your house.
 Q Any other finance experience?
 A Quite a bit of finance experience as reading annual reports of corporations in which I own stock.

8. Tr. at 589–91.

9. Tr. at 593–94, 619.

10. Tr. at 678.

11. Tr. at 81; PX 21, 22.

12. Tr. at 121–32.

age to above-average fashion.[13] He also said that Rooney had been cooperative and thorough in his dealings with Ossler while Rooney worked in cargo charters at JFK in the late 1960's.[14]

Ossler's last position with TWA was Director of Flight Operations in the Cargo Department in Manhattan, from June to August 1976, during which he supervised Rooney when he was Manager of Freight Regulations and Procedures. At trial Ossler testified that Rooney did an "outstanding" job in that position,[15] although in prior deposition testimony, he acknowledged that he had not observed or been stationed with Rooney long enough to evaluate his performance in a formal manner.[16]

Plaintiff also introduced management performance evaluations of Rooney conducted by his supervisor, R. E. Pearles, in March 1977 and March 1978. In both, Pearles gave Rooney an overall evaluation of "4" on an ascending scale from "1" to "6". Pearles's comments on both were identical, and included the following: "Works very well with station personnel to achieve unit goals and objectives"; "[m]anages unit function in efficient manner with little direction required from his Manager"; "[h]as excellent knowledge of most facets of Cargo Operation. Also has extensive background in Ticketing, Budgets, Training"; "[d]oes good job of organizing and setting priorities"; and "[w]orks well with other managers of various levels." Pearles also stated in both evaluations that Rooney had "no subordinates [and] [n]eeds an assist in self motivation." [17]

Between October 1976 and August 1979, Rooney allegedly applied for more than fifty jobs within the TWA system.[18] Never-

theless, plaintiff contended at trial that only eight of these positions were denied Rooney because of his age. Near the end of trial, the parties stipulated to withdraw Rooney's claims with respect to two jobs,[19] and plaintiff has since apparently abandoned its claims with respect to two others.[20] Thus, only four denials of promotion are still contested.

1. Senior Analyst, Rate Proceedings (Kansas City)

Rooney applied for the position of Senior Analyst, Rate Proceedings in March 1977 when he was forty-nine years old.[21] Plaintiff did not adduce evidence of the stated job requirements. Rooney testified, however, that the duties of the position included research and analysis leading to the preparation of reports and exhibits for rate and other proceedings before the Civil Aeronautics Board ["CAB"], and assisting TWA personnel who would testify or otherwise be involved in such proceedings.[22]

Rooney was not selected for this position, but plaintiff did not adduce any evidence as to the name, age or qualifications of the successful applicant for the job. Indeed, Rooney testified that he did not know whether the job was ever filled.[23] Rooney and plaintiff requested this information, but defendant was not able to locate any records pertaining to this position.[24]

2. Supervisor, Customer Services (Phoenix)

Rooney applied for this position in June 1977 and was rejected later that month.[25] Essentially, the job involved supervision of all customer service functions at the Phoe-

---

**13.** Tr. at 124.

**14.** Tr. at 124–25.

**15.** Tr. at 122.

**16.** Tr. at 149–52.

**17.** PX 89, 90.

**18.** PX 92.

**19.** Tr. at 833; PX 307, 310.

**20.** PX 308, 309.

**21.** PX 305.

**22.** Tr. at 620–22.

**23.** Tr. at 644.

**24.** Tr. at 751–52.

**25.** PX 304.

nix airport, and its stated qualifications included "in-depth knowledge" of such functions.[26] Rooney admitted that he had last performed customer service functions at an airport in 1960 in Chicago.[27] Nevertheless, Ossler, who had previously supervised similar personnel, testified that Rooney was qualified for the position.[28]

The successful applicant was James States, a thirty-six year old Group Supervisor of Customer Services at the Albuquerque airport, who had been performing functions identical to those required for this position for the previous six years. States had also held management positions since 1970 and had subordinates reporting to him in 1977.[29] At the time of selection, Rooney had no one reporting to him.[30] States also had an overall management performance evaluation of "5," as opposed to Rooney's "4."[31] R. A. Barba, who made the selection, wrote to Rooney as follows: "A large number of applications were received from employees such as yourself and I chose to interview those employees whose background, work experience, and work record appeared best for the position."[32]

3. Staff Analyst, Cargo Marketing (New York City)

On October 4, 1978, Rooney applied for this position by writing to Pearles.[33] Rooney's March 1978 management performance evaluation was later attached. The job opening announcement listed the following qualifications: "Cargo field sales experience desired—finance and/or data services experience helpful."[34] Rooney had two years of cargo sales experience as Manager, Cargo Charter Sales in New York City, although he did not have any cargo sales experience in a field position.[35] Rooney's testimony that he had been involved in direct selling to customers and that he was responsible for assisting field personnel in making sales was not reflected in his personnel records and Rooney did not otherwise mention this experience in his application. Rooney's management performance evaluation indicates that he had background in budgeting, although Rooney testified that his finance experience was limited to private real estate and stock transactions.[36] Ossler, who had supervised cargo sales personnel, testified that Rooney was qualified for this position.[37]

Randy Zimnowski, age thirty-one, was selected for the position. Zimnowski obtained cargo field sales experience at the Philadelphia airport in his position as Analyst "A" in Cargo Services in 1977. He also gained finance experience working as a Senior Analyst in the controller of flight operations department in Philadelphia from 1975 to 1977.[38] Ann Anderson, a TWA personnel administrator, testified that a review of Rooney's and Zimnowski's employment records revealed that Zimnowski was better qualified for the position.[39] Although Anderson admitted that she did not know either employee personally,[40] plaintiff did not adduce any evidence to indicate that the decision-maker at the time of selection knew either employee personally.

26. DX IC.

27. Tr. at 639.

28. Tr. at 131.

29. Tr. at 640, 962–63; DX IC.

30. Tr. at 963.

31. Tr. at 962; PX 89; DX IC.

32. PX 304. Ten of the 20 applicants interviewed were management employees. Five of these employees had an overall evaluation of "5," three had an overall evaluation of "4," and two had no indication of an evaluation. DX IC.

33. PX 306.

34. *Id.*

35. Tr. at 599–600, 645–46.

36. Tr. at 646–47; PX 90; *see* note 7 *supra.*

37. Tr. at 131.

38. PX 319.

39. Tr. at 995–96, 1002–03; DX XA–1.

40. Tr. at 997–98, 1005.

4. Supervisor, City Ticket Offices (Kansas City)

Rooney applied for this position in January 1979 in a letter to Mr. Pearles.[41] The stated qualifications were that the applicant "be sales and/or marketing oriented [and have] strong administrative/leadership/analytical and communicative skills," in order to "[s]upervise the operation and marketing efforts of six district ticket offices."[42] Rooney had experience in ticketing operations, although his job-related experience was limited to airport ticketing, as opposed to city ticket office ticketing. He also had other sales and supervisory and administrative experience.[43]

The successful applicant for this position was William Morgason, age thirty-four, who obtained the position by lateral transfer, whereas it would have been a promotion for Rooney.[44] Morgason was an account executive in the sales department in Kansas City at the time of his selection,[45] and his responsibilities included "calling on major businesses within the Kansas City area, travel agents, soliciting, generating new business within those businesses and travel agents."[46] In this capacity, he had frequent contact with the city ticket offices in Kansas City.[47]

*Maxwell McFall*

Maxwell McFall, born February 24, 1931, joined TWA in 1952 as a Cargo Agent in Kansas City. He became a Transportation Agent in 1953, a Lead Transportation Agent in Tulsa in 1956, and a Passenger Relations Representative in 1957. He transferred to Washington, D. C. in 1962, and returned to Tulsa in 1963 as Supervisor of Station Operations. In 1966, he was promoted to Assistant Ramp Manager at O'Hare Airport in Chicago, and in 1967 he was promoted again to District Transportation Manager in Atlanta. In 1968, he was promoted to Manager, Cargo Sales and Services in St. Louis, where he became Manager of Freight Services in 1971. In 1972, he left St. Louis to become Manager, Freight Service Programs in New York City in the Cargo Staff department. In 1974, the title of his job was changed to Manager, Freight Operations and Procedures. In the latter position, McFall supervised two Analysts. In August 1976, however, he was demoted to Analyst, Central Cargo Control in Kansas City.[48]

The evidence established that McFall had experience in a wide variety of jobs throughout the TWA system in customer services and cargo sales, and also had considerable supervisory and administrative experience. In several management performance evaluations and letters of commendation, McFall's performance was rated anywhere from adequate to outstanding.[49]

In 1976 and 1977, McFall applied for approximately forty positions within the TWA system.[50] Plaintiff contends, however, that only three of these positions were denied to McFall because of his age: Manager, Cargo Sales and Services (St. Louis), General Manager, Cargo Sales and Services (JFK), and Supervisor, Customer Services (Tulsa). Subsequently, in September 1977, McFall was promoted to Manager of Cargo Services in Philadelphia. A year later, at the age of forty-seven, McFall was transferred at his request to the position of Manager, Ground and Aircraft Services, also in Philadelphia. He held the latter position at the time of trial.[51]

41. PX 311.

42. *Id.*; DX FL–3.

43. Tr. at 589–94, 599–600.

44. Tr. at 917; PX 84. Rooney was interviewed for this position. PX 311.

45. PX 322.

46. Tr. at 917.

47. Tr. at 677–78.

48. Tr. at 531–47; PX 29, 30, 31.

49. PX 34, 35, 36, 39, 40, 41, 42, 43, 45.

50. Tr. at 570.

51. Tr. at 569–70; PX 29.

### 1. Manager, Cargo Sales and Services (St. Louis)

McFall applied for this position in October 1976.[52] He had held the position from 1968 to 1971, and the job had essentially remained unchanged since then.[53] Ossler, who through his position as Manager of Cargo Services at JFK had many dealings with McFall while McFall held the position in St. Louis, testified that his performance there was "outstanding."[54]

Defendant selected J. H. O'Neill, age thirty-one, for this position, who was then the Acting Manager, Cargo Sales and Services in St. Louis.[55] The Acting Manager's position was identical to the Manager's position. As Acting Manager, O'Neill reported directly to a Mr. Bell, who made the decision to hire him. In addition, O'Neill received high praise from R. A. Miller, who occupied the Manager's position prior to O'Neill's selection.[56]

### 2. General Manager, Cargo Sales and Services (JFK)

In January 1977, McFall applied for this position, the duties and qualifications for which were essentially the same as those for the Manager's position in St. Louis.[57] John S. Nord, age thirty-four and a Manager, Dining and Commissary at JFK, was selected for the position.[58] Nord's most recent management performance evaluation had been prepared by John E. Murphy, who reported directly to the decision-maker, H. W. Cox.[59] Nord received the highest possible rating on that evaluation, a "6," while McFall had received a "5" on his most recent evaluation in January 1976.[60] Cox informed McFall of his rejection, noting that "[a]lthough your background is impressive, I have chosen to interview those whose background, work experience, and work record appeared to suit them best for the position."[61]

### 3. Supervisor, Customer Services (Tulsa)

McFall applied for this position in May 1977 and included the March 1977 performance evaluation prepared by R. E. Pearles.[62] This evaluation reflected McFall's recent demotion from a Manager's position to an Analyst's position, and rated McFall as a "4" in virtually every category, including the overall category.[63] McFall had held a similar position from 1963 to 1966 in Tulsa, but the last time he had been stationed at an airport was 1972.[64]

Defendant selected Sheila Guerra, age thirty-four, for the position. At the time, Guerra was a first level supervisor in the reservations office in Los Angeles and responsible for work direction, hiring and discipline of employees in customer service functions. The Supervisor's position for which she was selected in Tulsa involved the same supervisory responsibilities.[65]

### John F. Murphy

John F. Murphy, born September 29, 1929, joined TWA at the age of twenty in 1950 as a cargo handler in Chicago. He held a series of other jobs in Chicago before joining the Cargo Staff department in New York in 1959 as Assistant Director of Mail and Express Sales. After a brief assignment as District Manager of Mail and Express Sales at JFK in 1962, Murphy returned to Cargo Staff as Director of Mail

---

52. PX 281–a.

53. Tr. at 555.

54. Tr. at 98–99.

55. DX FK–2.

56. Tr. at 860–63.

57. PX 281–c.

58. DX FK–6.

59. Tr. at 574–75. The Court notes that John E. Murphy is not John F. Murphy, a claimant in this action.

60. Tr. at 932; PX 35; DX FK–6.

61. Tr. at 575–76; PX 281–c.

62. PX 281–d.

63. Tr. at 572; PX 36.

64. PX 29.

65. Tr. at 864–67; DX FK–4.

and Express Sales. In 1968, he became Manager of Government Air Freight Sales, which he held until he was transferred to Chicago in 1970 as Manager, Cargo Sales and Services. In 1971, he returned to Cargo Staff as Manager of Mail and Express Sales and Services. Three years later, at age forty-five, Murphy was promoted to Director of Government Cargo Sales and Services, which he held until his demotion in August 1976 to Manager of Government and Military Sales, his current position.[66]

Although Murphy's managerial career at TWA included one year in general cargo sales and services, he spent virtually all his time in the area of solicitation and handling of mail and other Government freight.[67] In his Director's position, Murphy had the responsibility of developing plans and programs for both domestic and international mail services. In management performance evaluations prepared in 1972 and 1976, Murphy's performance was rated from acceptable to outstanding in the various categories. In addition, during the ten years prior to August 1976, Murphy received numerous merit increases.[68]

When the Cargo Staff department was reorganized in August 1976, Murphy was demoted from a Director to a Manager position, but his responsibilities remained essen-

tially unchanged.[69] The demotion was effective August 16, 1976. The next day, TWA posted job opening announcements for three new Director positions created by the reorganization—in Cargo Services, Cargo Marketing and Cargo Sales.[70] Murphy learned of these openings soon thereafter and applied for all three on August 23, 1976.[71]

1. Director, Cargo Services (New York City)

The required qualifications for this position were stated as follows: "Must have substantial exposure to various cargo service or service related activities. Must have proven skills in managing people in various positions."[72] TWA selected Roland A. Mosher for the position, who, at age thirty-five, had been Manager of Passenger Services Operations at the Los Angeles airport since 1974. He also had cargo experience for five years as an accountant.[73]

Defendant's Staff Vice President of Cargo Sales and Services, Charles Martin, made the decision to hire Mosher. Martin testified that he did not select Murphy because his "whole career had been dealing with the post office and a little bit of military. [He] had no qualifications to do the other jobs.... [He] spent his whole career deal-

---

**66.** Tr. at 239–47; PX 14, 16–a, 17, 18, 19. The title of the Manager of Government and Military Sales position was subsequently changed to Manager of Postal Affairs and Government Freight Sales. Tr. at 246.

**67.** DX XA–2 at 95 (deposition of Charles Martin) [hereinafter "Martin Deposition"].

**68.** Tr. at 247–48; PX 14, 17, 18, 20.

**69.** Martin Deposition at 96.

**70.** PX 20–b, 20–c, 20–d, 20–e.

**71.** Tr. at 251–56; PX 20–a. In view of (1) the Court's finding that Murphy received actual notice of his new position in the reorganized Cargo Staff department prior to August 15, 1976, see Tr. at 7, and (2) defendant's claim that Martin told Murphy at the same time that Murphy would not be considered for the three new director positions created by the reorganization, defendant argues that Murphy's claims are barred by the statute of limitations. See Tr. at 1–11; note 1 supra. Defendant, how-

ever, has adduced no evidence to support the latter claim. Indeed, Murphy testified that he did not learn of these openings until after August 17, 1976, Tr. at 255, 275–77, and the documentary evidence establishes that defendant did not consider the three positions "open" until August 17, at the earliest, PX 20–b, 20–c, 20–d, 20–e. Moreover, Martin testified that he filled the newly-created positions through TWA's job posting system, and that the employees in the Cargo Staff department were allowed to apply for these positions. Tr. at 85–91. Therefore, although the positions were created in the reorganization, they did not become available until August 17 and Murphy was then eligible to apply. Because Murphy applied after August 15 and the positions were filled after August 17, his claims with respect to these positions are not time-barred.

**72.** PX 20–c.

**73.** PX 146, 147; Martin Deposition at 118–20.

ing with mail, all of it. One hundred percent of the time that I know of."[74] Martin also testified that he selected Mosher because he "[h]ad experience, some of that in cargo accounting, some in passenger accounting, some in ramp services, some in airport operations, and the last year or two in cargo services and managing the cargo facility at Los Angeles."[75] When asked why he believed Mosher to be more qualified than the other applicants, Martin testified:

> He had—one of the problems with this cargo staff group is that all the people on the cargo staff in the past had been on the cargo staff for a long time and hadn't had current field experience, therefore in my opinion were not relating to the day to day problems of the field cargo people who needed the help of that group. And [Mosher] had a combination of current cargo experience, the operations experience at the airport which is the side where they load all the things onto the passenger airplanes. He had the exposure to automation when he was in accounting and had the interest and enthusiasm to do that job. So he had a broad mix of experience and it was all current.[76]

**2. Director, Cargo Marketing (New York City)**

The following were stated as the qualifications for this position: "Must have substantial experience in marketing, specifically advertising planning. Must also have proven creative ability in addition to people management skills."[77] Philip U. Moore, age thirty-three, was selected for the position. At the time, Moore had been Manager of Freight Sales Development in New York for four months. Prior to that, Moore had supervised the sales and services training program and been an instructor in sales and marketing training for several years.[78]

Martin's testimony that he did not hire Murphy for any of the three positions for which he applied because of his exclusively mail services background applies to this position as well. Martin specifically testified that he hired Moore because:

> Phil had, prior to working at TWA, been involved in marketing with some consumer goods company which I don't remember now. Had been involved in cargo services and had for about three years been involved in training all the sales people for the entire cargo organization and came to cargo staff in charge of a marketing related function and had the basic mental skills, understanding of what we needed to get done, to do that job in my opinion.[79]

**3. Director, Cargo Sales (New York City)**

Finally, Murphy applied for the position of Director, Cargo Sales. Defendant listed the following as qualifications for the job: "Must have specific functional industry experience. Must have been a field cargo sales or sales and service manager. Proven ability to manage, motivate, train and evaluate a direct sales force in the cargo industry."[80] Galbie D. Robinson was the successful applicant. Plaintiff did not establish Robinson's age, although Martin testified that Robinson was "forty-ish. Could have been thirty-nine, could have been forty-two."[81]

Again, Martin's testimony with respect to Murphy's lack of qualifications for any of the three positions applied. Moreover, Martin testified that he selected Robinson for the following reasons:

> [Robinson] had something like ten years with TWA, started as a cargo sales rep in Columbus and then became a senior cargo sales rep, was in field cargo sales for

---

74. Martin Deposition at 95.

75. *Id.* at 118–19.

76. *Id.* at 119.

77. PX 20–d.

78. PX 149, 150; Martin Deposition at 103–04.

79. Martin Deposition at 103–04.

80. PX 20–e.

81. Martin Deposition at 121.

probably about five years and then was brought into the training group and was totally responsible for all cargo sales and sales management training.

. . . .

Q. What made him so qualified for this new director's job?

A. His experience and knowledge was also current because he had been training current salespeople, got the feedback on the problems they had as well as sales managers, knew what needed to be done, had been there himself.[82]

*Roger Cutrufello*

Roger Cutrufello, born March 2, 1935, joined TWA a Cargo Agent in 1957, loading cargo on passenger and cargo aircraft. In 1959, he became a Transportation Agent, boarding passengers and monitoring the loading of cargo, and in 1964 he was promoted to Flight Information Coordinator ["FIC"]. An FIC coordinates information on arrivals and departures and advises departments and dispatch offices at other airports accordingly. All three of these non-

management positions were located at the Philadelphia airport.[83] In each, Cutrufello's performance was rated as good.[84]

In December 1975, at age forty, Cutrufello was transferred on special assignment to Saudi Arabia pursuant to a management contract between TWA and the Saudi Arabian Airlines ["Saudia"].[85] As an FIC for Saudia, Cutrufello performed essentially the same duties he had performed in Philadelphia for the previous ten years.[86] The position was technically considered a management position by Saudia, although as far as TWA was concerned the position was nonsupervisory and therefore remained nonmanagement.[87] In his only performance review, Cutrufello received an overall rating of "2" out of a possible "6."[88]

The Saudia assignment was planned to last two years but, in January 1977, Cutrufello and seventeen other TWA special assignment employees were prematurely terminated by Saudia.[89] Cutrufello testified that he was not told the reason for his termination except that it "was for the

---

**82.** *Id.* at 120–21.

**83.** Tr. at 297–99; PX 186.

**84.** PX 188, 189, 190, 191, 192, 193, 194, 195.

**85.** Tr. at 299; PX 186.

**86.** Tr. at 358–59.

**87.** F. R. Ruocco, TWA's Manager of Special Services Personnel, testified:

Mr. Cutrufello never had any [supervisory experience] at all, at least with our company, according to his records.

Q He had a management title with Saudi Arabian Airlines, did he not?

A Yes, he did.

Q Did that indicate to you that he had supervisory experience?

A It did not.

Q Why not?

A By the job that he had over there, which was purely nonsupervisory as we look at it here in the States.

Q Are job titles with Saudi Arabian Airlines and job titles with domestic TWA positions comparable?

A In some cases only.

Q Are there some TWA job functions which are nonmanagement which have a management title in Saudi Arabia?

A Yes.

Q Would flight information coordinator be one of those jobs?

A That is correct.

Tr. at 807–08. In addition, Cutrufello acknowledged on cross-examination that in Saudi Arabia he never supervised TWA personnel or a unionized work force, and that he reported to a TWA Senior FIC. Tr. at 359.

**88.** DX HE. This evaluation was dated November 7, 1977, and was received by TWA in the United States on January 3, 1978. Since Cutrufello applied for the contested jobs prior to TWA's receipt of this evaluation, none of the decision-makers considered it. The evaluation is, however, relevant with respect to the weight to be given Cutrufello's own perception of his qualifications. In fact, Ruocco testified that based on Cutrufello's job history and this evaluation, Cutrufello was not qualified to assume a management position. Tr. at 810. Although Ruocco was not a decision-maker, his opinion of Cutrufello's abilities was reflected in the advice he gave Cutrufello regarding which positions to apply for. *See* pp. 1200 1201 *infra.*

**89.** Tr. at 299; DX HG.

convenience of Saudia." In addition, Cutrufello believed that Saudia had reneged on its promise to provide adequate housing for him and his family.[90]

TWA furloughed Cutrufello upon his return to the United States. Until April 12, 1977, he was paid his full salary from Saudia, and from then until December 10, 1977, the day on which the two-year assignment was to have ended, TWA paid him at the same rate.[91] During this period, Cutrufello performed no services for the company.[92]

Although TWA assisted Cutrufello in his efforts to secure a new assignment,[93] at no time did any TWA employee guarantee Cutrufello that he would be reassigned.[94] Indeed, defendant's procedures in this area, as set forth in a company policy manual, do not contain any job guarantee upon return from special assignment.[95] Defendant followed its procedures in Cutrufello's case.

Cutrufello testified that he applied and was rejected for more than 200 positions within the TWA system during 1977 after his return from Saudi Arabia—over 100 in writing and over 100 by telephone.[96] Cutrufello claimed that he applied for every job opening in the TWA system[97] and that he was qualified to hold any position except pilot.[98] In any event, plaintiff now maintains that Cutrufello was denied thirty-nine positions because of his age.

In contrast to Cutrufello's experience, all seventeen other TWA employees prematurely terminated by Saudia at the same time as Cutrufello obtained reassignment within the TWA system no later than December 1977. Two-thirds were reassigned within six months. Eight of the returnees were over forty years of age, and seven were older than Cutrufello. The group included individuals from all organizational and salary levels and from stations throughout the United States.[99]

Because Cutrufello had no management experience and his employment records did not indicate any significant supervisory experience, F. R. Ruocco, TWA's Manager of Special Services Personnel who assisted Cutrufello in his reassignment search, advised Cutrufello not to apply for management positions.[100] Ruocco further advised Cutrufello to concentrate his efforts in Philadelphia where he had worked eighteen and one-half years: "I feel that by keeping in constant personal contact with your former supervisor and associates in Philadelphia ... your chances of reassignment are far better than by bidding into managerial jobs and locations where you are unknown."[101] Ruocco contacted the Philadelphia personnel department on Cutrufello's behalf, and was told that it "would [be] more than ...

90. Tr. at 299.

91. PX 200.

92. Tr. at 371–72.

93. Tr. at 802–14.

94. Tr. at 362–63, 483–90; PX 200; DX GO, GP.

95. Tr. at 798; DX HF.

96. Tr. at 374.

97. Tr. at 499–500. At trial, Cutrufello had an independent recollection of only ten positions for which he applied. Tr. at 387–89.

98. Tr. at 434–35 ("I feel qualified for any position within that company except flying the airplane."), 511. Cutrufello also testified as follows:

> Q You applied—let me get this straight. You sent in an application for every job opening in the system?

> A Every job opening in the system from the time I was laid off—it came out, I applied for it. That was anywhere that I was qualified for, I put in for it.
> Q Were you qualified for every job opening in 1977?
> A Every job opening that I put in for I was qualified for.
> Q So you didn't apply for every job opening, did you?
> A No.
> Q How do you know today which jobs you applied for and which you didn't apply for?
> A Some jobs that I really wanted and I know that I put in for it, I know that I should have got it and I didn't get it.

Tr. at 385.

99. DX HG.

100. Tr. at 807–09; PX 222.

101. PX 222.

happy to consider him for something that he was qualified for."[102] Cutrufello apparently never applied for any positions in Philadelphia and in fact established residence in California.[103] Every other non-management employee who returned from Saudia with Cutrufello was reassigned either at his prior station or in the same city, including those over forty years of age.[104]

Aside from the common sense of Ruocco's advice, it was TWA's policy to the extent possible to prefer local candidates over non-local candidates for nonmanagement positions. TWA's purpose in so doing was to boost the morale of the local workforce, to retain employees familiar with local operations and to reduce the company's payments for relocation costs.[105] Plaintiff claims Cutrufello applied for fourteen nonmanagement positions, for which a total of approximately thirty applicants were selected. Of these thirty, twenty-six were local candidates.[106] Cutrufello was a non-local candidate for all fourteen job openings.

The other twenty-five contested positions were management level positions. Cutrufello never held a management position during his twenty years with TWA and his employment records do not reflect any significant supervisory experience.[107] Moreover, during 1976 and 1977, TWA reorganized its management workforce at airport locations. This so-called "FORT"[108] reorganization had the effect of eliminating many lower level supervisory positions. All supervisors who lost their jobs were assured of securing some other position with TWA, but still had to apply for the newly created positions.[109] These individuals were thus in competition with Cutrufello generally, and five of the positions were filled by applicants who were former supervisors or group supervisors at the time of their selection.[110]

Some time in mid-1977, Cutrufello telephoned Robert J. Lauchlan, Staff Vice President of Special Services and Ruocco's superior, to complain about his inability to secure a new assignment despite having applied for eighty-seven positions.[111] Lauchlan alerted Ruocco and Ruocco assigned his subordinate, Mary Jean Wolf, to investigate. On November 9, 1977, Wolf advised Ruocco as follows:

> I find that many of the Job Opening Announcement numbers [Cutrufello] listed never existed, and that others do not correspond with jobs where his PER 288[112] was received. Additionally, it is my understanding that he did receive an interview in New York, for Quality Assurance Representative, contrary to his assertion that he received no response at all from the New York area.
>
> I also note that some of the JOA numbers are for secretarial positions, or other jobs that he is not suited for, such as Manager Cargo Customer Services, JFK.
>
> St. Louis claims that they never received a PER 288, or letter of application, for any of the seven jobs he allegedly applied for at that station.
>
> In view of this large number of discrepancies, I feel it would not be fruitful to continue to investigate Mr. Cutrufello's complaints. I would not recommend providing the information he is seeking un-

---

**102.** Tr. at 809.

**103.** Tr. at 367, 420–21, 490.

**104.** DX HG.

**105.** Tr. at 848, 947.

**106.** DX HJ, HK, HO, HP, HR, HT, HU, HV, IL, IS, IT, IU.

**107.** Tr. at 807–08; PX 186.

**108.** FORT stands for Field Organization Review Team. Tr. at 855.

**109.** Tr. at 855–58, 951–52.

**110.** Tr. at 851–53; PX 209, 214, 221, 225, 228; DX HN, HX, IA, IC, ID.

**111.** Tr. at 811.

**112.** A PER–288 is a TWA "Job Opportunity Request" form, which a nonmanagement employee would use in conjunction with a resume to apply for an open position. Tr. at 803–04.

less and until he is able to better represent his problem.[113]

Ruocco advised Cutrufello accordingly on November 11.[114]

Cutrufello nevertheless renewed his complaints in a letter to D. M. Crombie, Senior Vice President of Administration, dated February 21, 1978. Cutrufello charged that TWA discriminated against him on the basis of his age in not providing "normal severance pay," not continuing to forward job opening announcements and not placing him.[115] Crombie responded that Ruocco and Lauchlan had indeed aided Cutrufello in his job search, and that additional severance pay was inappropriate in view of the fact that Cutrufello had already received a ninety-day severance payment and an additional nine months full salary and benefits. Crombie also reminded Cutrufello of TWA's policy not to continue forwarding job opening announcements after an employee is separated.[116]

At trial, defendant contended that Cutrufello did not apply for many of the jobs still contested, that many of the openings were filled by employees older than Cutrufello, and that many of the selected applicants were clearly more qualified than Cutrufello. The Court will consider each job separately.

1. Customer Service Agent (Newark)

Other than Cutrufello's testimony that he applied for every job opening in the TWA system, there is no evidence that he applied for this position. In addition, a TWA personnel administrator testified that he searched TWA's job files but could not locate an application from Cutrufello for this position.[117] In any event, the evidence established that the duties of a Customer Service Agent included airport ticketing, check-in and passenger assistance.[118] Cutrufello testified that his experience as a Transportation Agent from 1959 to 1964 and his past experience in general qualified him for this and the other Customer Service Agent positions for which he applied.[119]

Three applicants were selected, all of whom were under forty years of age.[120] Two were part-time Customer Service Agents at the time of their selection, performing functions identical to those performed by full-time Customer Service Agents.[121] The third successful applicant was a Reservation Sales Agent in a city ticket office, and as such had extensive knowledge of TWA's Computerized Passenger Information System ["PARS"].[122] Cutrufello had no PARS experience [123] and his ticketing experience generally was limited to non-computerized ticketing at least thirteen years prior to his application.[124] In addition, all three successful applicants were from the New York area, while Cutrufello resided in California.

2. Customer Service Agent (St. Louis)

Although Cutrufello testified [125] that he applied for this position,[126] no documentary evidence was adduced to support this contention. Indeed, defendant's employment records contain a list of applicants on which Cutrufello's name does not appear.[127] Cutrufello nevertheless testified that his expe-

113. PX 233.

114. PX 234. Ruocco's November 11 letter is substantially identical to Wolf's memorandum.

115. PX 237.

116. PX 238.

117. Tr. at 890; DX IU.

118. PX 242–aa.

119. Tr. at 298–99, 342.

120. DX IU.

121. Tr. at 402–04; DX IU.

122. Tr. at 403–04; DX IU.

123. Tr. at 404.

124. Tr. at 353–57.

125. Tr. at 336.

126. PX 242–d.

127. DX HK.

rience as an FIC qualified him for this position.[128]

Of the three successful applicants, two were Reservation Agents at the time. A Reservation Agent's duties are similar to a Customer Service Agent's duties.[129] Both applicants were from St. Louis and both were under forty.[130] The third successful applicant was forty at the time of selection and had returned from Saudia about the same time as Cutrufello, where he had held a management position.[131]

**3 and 4. Customer Service Agent (Chicago)**

Cutrufello testified that he applied for two Customer Service Agent positions in Chicago,[132] although the relevant lists of applicants in TWA's employment records do not contain Cutrufello's name.[133] As in the other customer service positions, the only evidence of Cutrufello's qualifications was his own testimony that his background as a Transportation Agent qualified him. Cutrufello admitted, however, that he had no experience in computer ticketing and that his other ticketing experience was limited.[134]

Both of the successful applicants for the first position were under forty. One was a Reservations Sales Agent in Chicago at the time of selection, whose duties were similar to that of a Customer Service Agent. The other successful applicant had training in PARS and was an agent in the central reservations control office in Kansas City. The position he held was very similar to the Customer Service Agent position for which he was selected.[135]

The second Customer Service Agent position in Chicago was filled by six applicants,[136] five of whom were under forty.[137] All the successful candidates were either Customer Service Agents, Reservation Agents or Ground Hostesses, and all had recent and relevant job experience in customer contact functions.[138] Cutrufello had last held a customer contact position in 1964. Four of the six selected were from the Chicago area.

**5. Customer Service Agent (JFK)**

Cutrufello testified that he applied for this position [139] and that his prior TWA experience qualified him for the job.[140] A TWA personnel director testified, however, that TWA's employment records did not indicate that Cutrufello had applied.[141] In addition, Cutrufello's name does not appear in a special logbook maintained by TWA to record all applications for positions at JFK, LaGuardia Airport and Newark Airport in 1977.[142]

The three recipients of the job, ranging in age from twenty-three to twenty-five, were part-time Customer Service Agents at JFK performing functions identical to full-time Customer Service Agents.[143] All three received excellent recommendations from their supervisors.[144]

**6 and 7. Customer Service Agent (San Francisco)**

Cutrufello testified that he applied for two Customer Service Agent positions in

128. Tr. at 336.

129. Tr. at 850–51.

130. DX HK.

131. PX 282; DX HK.

132. PX 242–e, 242–g.

133. Tr. at 337, 340; DX HO, HP.

134. Tr. at 353–57.

135. Tr. at 923–25; DX HO.

136. DX HP.

137. PX 282.

138. DX HP.

139. PX 242–h.

140. Tr. at 341.

141. Tr. at 884–85; DX IL.

142. Tr. at 893–94; DX FK–5.

143. Tr. at 884–85; DX IL.

144. DX IL.

San Francisco,[145] and again referred to his prior TWA experience as evidence of his qualifications.[146] Plaintiff, however, produced no documentary evidence to show that Cutrufello applied for these positions.

The first of the two positions expressly required knowledge of PARS. Cutrufello did not have PARS experience.[147] Two of the three persons selected had extensive knowledge of PARS through their airport ticketing experience, and the third was a part-time Customer Service Agent at the time of his selection. All three held positions at the San Francisco airport at the time, and all were under forty years of age.[148]

The second Customer Service Agent position in San Francisco required background in "public contact work."[149] Although Cutrufello had such experience, he had last held a customer contact position in 1964.[150] The successful applicant, a thirty-two year old Ramp Serviceman, was stationed at the San Francisco airport when selected.[151]

8 and 9. Customer Service Agent (LaGuardia)

The only evidence adduced to show that Cutrufello applied for these two positions[152] was his testimony that he applied for every job opening in the TWA system.[153] A TWA personnel director could not locate any indication in the company's employment records that Cutrufello had applied,[154] and in the special logbook used to record all applications for positions at LaGuardia, Cutrufello's name does not appear.[155] Cutrufello testified that his past TWA experience qualified him for these positions.[156]

Two of the successful applicants for the first position were part-time Customer Service Agents at LaGuardia at the time of selection, and the third was a full-time Customer Service Agent at JFK.[157] Plaintiff produced no evidence as to the ages of the first two candidates; the third was forty-two.

One of the three successful applicants for the second position was a part-time Customer Service Agent at LaGuardia at the time of selection. Plaintiff produced no evidence as to her age.[158] The other two job recipients were in their twenties. One was a Senior Secretary at JFK who was highly recommended by her supervisor, and the other was a Reservation Sales Agent in Manhattan, whose most recent evaluation was excellent.[159]

10. and 11. Supervisor, Customer Services—Cargo and Supervisor, Customer Services—Ramp (Boston)

Plaintiff adduced no testimony that Cutrufello applied for these management positions other than his testimony that he applied for every job opening in the TWA system. In addition, plaintiff adduced no evidence that these positions were ever filled, although the evidence does indicate that the positions were posted.[160] Cutrufello testified that his "strong leadership abilities" qualified him for the cargo position, and that his ramp and FIC experience qualified him for the ramp position.[161] Cutrufello did not, however, have any significant

---

145. PX 242–i, 242–j.

146. Tr. at 345.

147. PX 242–i; DX HT.

148. Tr. at 945–46; DX HT.

149. PX 242–j; DX HU.

150. Tr. at 406.

151. DX HU.

152. PX 242–x, 242–y.

153. Tr. at 499–500.

154. Tr. at 889; DX IS, IT.

155. DX FK–5.

156. Tr. at 342.

157. Tr. at 400; DX IS.

158. DX IT.

159. Tr. at 889–90; DX IT.

160. PX 242–s, 242–v.

161. Tr. at 346–47.

customer service or supervisory experience and had never held a management position with TWA.[162]

### 12. Supervisor, Customer Services—Ramp (Las Vegas)

Cutrufello applied for this management position in May 1977.[163] Although he testified that his prior TWA experience qualified him for the position,[164] he was rejected in June because he was not considered among the best qualified applicants.[165] As noted above, Cutrufello's employment records do not reflect any meaningful supervisory experience, and he had never held a management position in his years with TWA.[166]

TWA selected seven applicants for this position, all of whom were at least Supervisors and two of whom were Group Supervisors at the time. All seven held positions that were eliminated in the 1977 FORT reorganization.[167] TWA had assured all individuals affected by FORT that they would be reassigned within the system, but required them to apply for the newly-created positions.[168] One such position was the Supervisor's position at issue, which was retitled as a Field Manager's position in the FORT reorganization.[169] Six of the seven successful applicants were under forty years old, and one was forty-six.[170]

### 13. Supervisor, Customer Service (Phoenix)

Cutrufello applied for this management level position in June 1977. The position expressly required "strong leadership abilities."[171] Although Cutrufello's employ-

ment records indicate that he had never held a management position or had significant supervisory experience, he testified that his FIC experience in Philadelphia and Saudi Arabia qualified him for the job.[172]

The successful applicant was James States, age thirty-six, a Group Supervisor of Customer Services in Albuquerque. States had held management positions since 1970, and his most recent management performance evaluation included a "5" overall rating. At the time of selection, States was performing the same functions at Albuquerque that were required for the Phoenix position.[173]

### 14. Passenger Service Agent in Charge (St. Louis)

Plaintiff produced no documentary evidence that Cutrufello applied for this position, and when asked whether he had applied, Cutrufello said: "I applied for a job like that."[174] The position's duties included working behind the ticket counter and supporting the ticket agents working there. Its stated qualifications included "ramp control agent experience."[175] Although Cutrufello had limited ticketing experience, he testified that he had ramp control agent experience as an FIC.[176]

The Passenger Service Agent in Charge supervises Customer Service Agents working in the control office at the St. Louis airport, and the job duties of the two positions are substantially the same.[177] Two of the three applicants selected were Customer Service Agents in the control office in St. Louis at the time of selection, one of whom

**162.** Tr. at 353–57, 807–08; PX 186.

**163.** Tr. at 348; PX 209; DX HX.

**164.** Tr. at 348.

**165.** Tr. at 950; DX HX.

**166.** Tr. at 807–08; PX 186.

**167.** Tr. at 951–53; DX HX.

**168.** Tr. at 856–58.

**169.** Tr. at 951.

**170.** DX HX.

**171.** PX 214; DX IC.

**172.** Tr. at 342.

**173.** Tr. at 962–63; DX IC.

**174.** Tr. at 322.

**175.** PX 242–b; DX HI.

**176.** Tr. at 323.

**177.** Tr. at 844–47.

was over forty years of age. The third job recipient was a Customer Service Agent at another office in St. Louis, but he had previous experience in the control office as well.[178]

### 15. Flight Information Coordinator (St. Louis)

Cutrufello testified that he applied for this position,[179] but TWA's employment records contain no such indication.[180] On cross-examination, Cutrufello admitted that he had no specific recollection of applying for this position.[181] The qualifications and duties of the position were essentially the same as those for the FIC position that Cutrufello had held for thirteen years.[182] TWA selected a thirty-five year old Customer Service Agent stationed at the St. Louis airport for the position.[183]

### 16. Flight Information Coordinator (Boston)

Although this position was posted in April 1977,[184] plaintiff adduced no evidence that Cutrufello applied or that the position was ever filled.

### 17–19. Crew Scheduler (JFK)

Plaintiff adduced no evidence that Cutrufello applied for these three management positions, other than Cutrufello's testimony that he applied for every job opening. In addition, a TWA personnel director testified that he had searched the respective job files but did not locate any applications from Cutrufello,[185] and the TWA New York-area logbook contains no indication that Cutrufello applied for any of these positions.[186]

All three positions required an "ability to work under pressure, handle detail work and interact efficiently and courteously with crew members."[187] Cutrufello testified that his FIC experience qualified him,[188] although he did not have any management experience. One of the three positions also required "knowledge of TWA/TWU work rule provisions."[189] Cutrufello did not possess such knowledge.[190]

For the first Crew Scheduler position, TWA selected a Senior Customer Service Agent at LaGuardia, whose employment records indicated that he had some supervisory experience.[191] Plaintiff adduced no evidence with respect to his age. For the second position, the one requiring knowledge of work rule provisions, TWA selected five applicants, all thirty years of age or younger. All five received excellent recommendations from their respective supervisors, and all were stationed in the New York area.[192] TWA selected a thirty-six year old Supervisor of Air Freight from LaGuardia for the third Crew Scheduler position. The Supervisor's position was a management position, which the applicant had held for two years. In his most recent management performance evaluation, he had received a "4" out of a possible "6."[193]

---

**178.** Tr. at 846–47; DX HI.

**179.** Tr. at 324.

**180.** PX 242–c; DX HJ.

**181.** Tr. at 380–81.

**182.** PX 242–c; DX HJ.

**183.** PX 242–c, 282.

**184.** PX 242–w.

**185.** Tr. at 886–87.

**186.** DX FK–5.

**187.** PX 242–q, 242–s, 242–t; DX IM, IO, IP.

**188.** Tr. at 346–47.

**189.** DX IO.

**190.** Tr. at 439. Cutrufello testified:

> Q Have you ever applied that contract?
> A I've had to read it because as it's on a station level, we put the hostess and the crew members in the rooms and we'd get a call from the crew scheduler who would be possibly taking a hostess off schedule and we had the book in our office but most of the time the rule was explained to us by the crew scheduler, why they're doing it, so we can in turn explain it to the hostess.

**191.** Tr. at 886; DX IM.

**192.** DX IO.

**193.** Tr. at 887; DX IP.

20. Crew Planner In-Flight Services (JFK)

As with the JFK Crew Scheduler positions, TWA's employment records contain no indication that Cutrufello applied for this position,[194] and the New York-area logbook also indicates that he did not apply.[195] The only evidence that Cutrufello applied was his testimony that he applied for every open position in the TWA system.

The stated qualifications for this management position included "knowledge of IFFA contract . . .; excellent organizational, administrative, and interpersonal skills." [196] Cutrufello had no management experience, and his employment records do not indicate any experience with the "IFFA contract." TWA selected a forty-nine year old Crew Planner In-Flight Operations from JFK for the position, who held a management position at the same organizational level as the contested position. The successful applicant performed very similar tasks in his former position.[197]

21. Crew Scheduler/In-Flight Services (Los Angeles)

The only evidence that Cutrufello applied for this position was his testimony that he applied for every job opening in the TWA system. TWA's employment records do not indicate that Cutrufello applied.[198]

The position's qualifications were essentially the same as the Crew Scheduler positions at JFK.[199] Cutrufello testified that his FIC experience qualified him.[200] TWA selected the Senior Secretary to the General Manager of In-Flight Services in Los Angeles for the position. She was forty years old at the time and was personally familiar with the duties of the Crew Scheduler position.[201]

22. Crew Scheduler/Flight Operations (Chicago)

TWA's employment records contain a list of all applicants for this position.[202] Cutrufello's name does not appear,[203] although he testified that he applied.[204] Defendant selected a thirty-two year old Reservation Sales Agent from Chicago for the position, who had received the highest possible non-management performance evaluation from his supervisor. His supervisor also highly recommended the applicant for this particular job.[205]

23. Crew Scheduler/In-Flight Services (San Francisco)

The only evidence that Cutrufello applied for this position was his testimony that he applied for every job opening in the TWA system. TWA's employment records do not contain any indication that Cutrufello applied.[206]

The position required knowledge of flight attendant functions, and Cutrufello testified that he was qualified.[207] One of the three successful applicants, all of whom were under forty, was a Flight Attendant Instructor, and a second was a Flight Instructor. The third successful applicant was a Customer Service Agent. All three were stationed at the San Francisco airport.[208]

24. Quality Assurance Representative (New York City)

Cutrufello applied for this management position and was interviewed, but was re-

---

194. PX 242–u; DX IQ.

195. DX FK–5.

196. PX 242–u.

197. Tr. at 888–89; DX IQ.

198. DX HZ.

199. PX 242–cc.

200. Tr. at 343.

201. Tr. at 954; DX HZ.

202. PX 242–f.

203. Tr. at 926–27; DX HQ.

204. Tr. at 339.

205. Tr. at 926–27; DX HQ.

206. DX HS.

207. Tr. at 345–46.

208. Tr. at 943–44; DX HS.

jected in July 1977.[209] The position entailed overseeing customer service activities at TWA's New York-area stations.[210] It required that the applicant (1) "possess good communication and analytical skills;" (2) "be self-motivated and able to work irregular hours with minimal supervision;" (3) "be able to interrelate with various levels of management;" and (4) "be well-organized and able to plan work to [meet] reporting deadlines." [211] Cutrufello testified that he was qualified because of his past experience and because of his "ability to look at other people's work objectively." [212] Cutrufello had no management experience.

TWA selected three applicants for the position. One was a twenty-six year old International Representative at LaGuardia, where he was involved in making group travel arrangements. His supervisor rec-ommended him highly for this position. A second successful applicant was a twenty-seven year old Ambassador's Club Receptionist at LaGuardia. She was also highly recommended. The third successful applicant was a forty-six year old Area Supervisor of Customer Services at JFK, a management position. He had not been selected for a Field Manager's position in the FORT reorganization and was highly recommended for the Quality Assurance Representative position.[213] Defendant's records indicate that Cutrufello was not hired because there were "[b]etter qualified applicants." [214]

### 25. Coordinator—Quality Assurance (Los Angeles)

Cutrufello applied for this position in October 1977 and was interviewed in Novem-

**209.** PX 218.

**210.** *Id.*; DX IE.

**211.** *Id.* As evidence of Cutrufello's lack of "communication skills," defendant introduced a letter from Cutrufello to Ruocco dated August 14, 1977, regarding Ruocco's efforts in securing a reassignment for Cutrufello. When asked if the letter reflected good communication skills, Cutrufello testified: "I don't feel I was being graded when I wrote the letter." Tr. at 415. The following is a literal reproduction of the body of the letter:

> THANK YOU FOR YOUR RECENT LETTER RECEIVED LATE BECUASE OF INCORRECT ZIP CODE. THIS IS WHY I AM SLOW IN MY REPLY.
> REGARDING MY WIFES RETURNED CHECK.MONEY ORDER WAS SENT TO ADDRESS AS INSTRUCTED.
> ONCE AGAIN THANK YOU FOR THE FOLLOWUP ON MY PAST JOB APPLICATIONS. THE MOST RECENT ARE
> 77585FIELD MANAGER EWR
> 77501FIELD MANAGER OKC
> 77587 CREW PLANNER JFK
> 77586 CREW SCHEDULER JFK
> MAY I SUGGEST A CALL FROM YOUR OFFICE TO MR. COXS REGARDING THE THREE N. Y. AREA JOBS ABOVE. HE IS FAMILIAR WITH MY PAST WORK RECORD AND I FEEL CONFIDENT HE WILL DO WHAT HE CAN IF JOBS ARE IN FACT OPEN.
> MY TRACK RECORD FOR PAST J. O. A. S. IS NOT TO ENCOURAGING APPLIED 74 REPLYS 15 INTERVIEWS 1 AS YOU CAN SEE NOT TO GOOD.
> IF YOU FEEL AN INTERVIEW WITH MR. MYERS OR MR. RYAN WOULD BE OF ANY HELP I WILL BE THERE AT ANY TIME,TO GIVE MY PLIGHT A FIRST HAND ORAL DISCEPION.
> MAINLY 20 YEARS OF DEDICATED SERVICE TO TWA.
> NOMINATED FOR AWARD OF EXCELENCE BY MY REGION, IN A NONPUBLIC CONTACT JOB.
> WAS FORCED TO LEAVE SAUDI ARABIA BECOUSE OF THE LACK OF HOUSEING IN LARGE FAMILY GROUPS. I LIVED IN A HOTEL FOR 13MONTHS 11MONTHS WITHXXX MY FAMILY A COST MINIMUM TO ME OF 1500 DOLLARS A MONTH TO EAT ONLY.
> I WENT TO DHAHRAN ,SAUDI ARABIA TO BETTER MY POSITIN WITH TWA. AND INCREASE MY EARNINGS.
> AT THIS TIME MY SALARY IS 162 DOLLARS LESS A MONTH THEN IF I NEVER LEFT MY STATION. BANK ACCOUNT POOR.
> I AM SURE YOU HAVE BEEN AWARE OF THIS PLIGHT FOR MANY MONTHS, AND DONT WANT TO SOUND DISTURBED BY YOUR DEPARTMENT, JUST SOME POINTS THAT CAN BE BROUGHT TO THE ATTENTION OF THOSE WHO ARE NOT AWARE.

PX 224.

**212.** Tr. at 342.

**213.** Tr. at 882–83; DX IE.

**214.** DX IE.

ber.[215] On November 30, TWA notified Cutrufello that it had decided to select finalists who "appear better suited and/or more qualified."[216] The job's duties and stated qualifications were essentially the same as for the prior contested position.

TWA selected a twenty-eight year old Supervisor of In-Flight Services stationed in Los Angeles, who had held that management position for nearly three years. In her last management performance evaluation, she received ratings of "4" and "5" in the various categories and an overall rating of "5."[217] Defendant introduced into evidence employment records and interview notes indicating that the decision-maker considered the eventual recipient of the job to be the best qualified applicant overall.[218]

### 26. Coordinator—Quality Assurance (Kansas City)

Cutrufello applied for this management position, which was essentially identical to the Los Angeles Coordinator's position, in May 1977.[219] Cutrufello testified that his past experience qualified him for the job.[220]

TWA selected a twenty-nine year old Customer Service Agent from Dayton for the position. This applicant had previously held the position of Quality Controller in Indianapolis for more than two years.[221] Ann Anderson, a TWA Manager of Job and Organization Analysis, testified that the Quality Controller position qualified the applicant for the contested position because the latter was "an expanded role of quality controller."[222]

### 27. Facilities and Equipment Maintenance Planner (San Francisco)

Cutrufello applied for this nonmanagement position in September 1977, but was not interviewed.[223] The job opening announcement stated that applicants "must have knowledge of facilities and equipment functions," and that the recipient would have to "maintain all records associated with G.E.A.R. program."[224] Cutrufello stated that his past experience qualified him for the job,[225] but on cross-examination he admitted that he did not know what the acronym "G.E.A.R." stood for and could not explain what the G.E.A.R. program entailed.[226]

The successful applicant was a thirty-nine year old Maintenance Coordinating Clerk in San Francisco. She received an excellent appraisal from her supervisor, and was highly recommended by the decision-maker.[227] After interviewing her, the latter stated: "This job would be an extension of her present duties, the only difference being new programs. She comes with an excellent evaluation from her present Supervisor .... Penny is familiar with our operations through her years of service ...."[228]

### 28. Quality Controller (St. Louis)

Cutrufello applied for this management position in August 1977, but was rejected.[229] The position involved monitoring service performance and required significant interaction with airport management.[230] It also required making "recommendations to the operating management in an effort to im-

215. PX 235.

216. *Id.*

217. Tr. at 958–59; DX IB.

218. DX IB.

219. PX 206.

220. Tr. at 347.

221. Tr. at 992–94; DX IH.

222. Tr. at 993–94.

223. DX HV.

224. PX 242–k.

225. Tr. at 345, 427.

226. Tr. at 426–27.

227. DX HV.

228. *Id.*

229. PX 203.

230. Tr. at 851–54.

prove the service level."[231] Cutrufello testified that his past experience and his ability to look objectively at other people's work qualified him for the position.[232]

TWA selected from among the fifty-nine applicants a Customer Relations Field Representative from St. Louis.[233] Plaintiff adduced no evidence with respect to her age. The decision-maker testified that the job functions of the successful applicant's former position and the contested position were related.[234]

### 29. Passenger Relations Representative (San Francisco)

Cutrufello applied for this nonmanagement position in May 1977, but was not interviewed.[235] The stated qualifications included "[g]eneral knowledge of airport operation in sales and services policies [and] [c]onsiderable initiative and judgment in handling passengers."[236] Cutrufello testified that his past experience, particularly his "passenger relations" experience in Saudi Arabia, qualified him for the job.[237]

TWA selected a thirty-four year old Senior Customer Service Agent from San Francisco for the position. He had held that position and the position of Customer Service Agent since 1969.[238] The credible evidence established that the Senior Customer Service Agent and Passenger Relations Representative positions encompassed very similar job functions, and that the recipient was qualified for the job.[239]

### 30. Supervisor, Fleet Services (JFK)

The only evidence adduced that Cutrufello applied for this management position[240] was his testimony that he applied for every opening in the TWA system in 1977. Defendant's employment records contain a listing of eleven applicants, all of whom were interviewed, but Cutrufello's name does not appear. Cutrufello's name also

---

231. Tr. at 854.

232. Tr. at 338. Cutrufello also gave the following testimony with respect to his qualifications for this position:

Q What was the title of the position you applied for in St. Louis involving quality assurance, do you know?

A I think it was a quality assurance agent. Like I say, this is going back a few years and it's pretty hard to recall.

Q Was it a management position or nonmanagement position?

A That's a nonmanagement position today, I think.

Q What was it in 1977 when you applied?

A I believe it was [nonmanagement]. I don't believe it was management then. I had been away from the company from 1975 in their structure.

Q I believe you testified that you thought you were qualified for that particular job because it involves looking at other people's work.

A Can I elaborate on that?

Q And that you're able to look at other people's work as well as anybody else. Was that your testimony?

A I don't remember that.

Q Why do you feel like you are qualified for that job?

A I feel I'm qualified for that job because I'm familiar with all functions on the ramp and operations ends of the airline and the ticket counter and cargo services that I can look at something objectively and one of the qualifications for the job would be to be able to look at it objectively. If you know too much about the job, you might make excuses for the personnel working there. And this is how the position was explained to me by a quality assurance manager.

. . . .

Q Would you look at Plaintiff's Exhibit 203 which should be before you.

Do you know any of the 59 applicants who are listed on pages 2 and 3 of that exhibit?

A No names that I could relate to.

Q You're not testifying that you were more qualified or as qualified as all 59 applicants for that position, are you?

A In my opinion, yes.

Tr. at 382–84.

233. DX HM.

234. Tr. at 851–54.

235. PX 210.

236. *Id.*

237. Tr. at 341.

238. DX HR.

239. Tr. at 941.

240. PX 242–m.

does not appear in the New York-area logbook.[241]

Essentially, the stated function of the Supervisor of Fleet Services was to oversee the cleaning of airplanes, including the planning and scheduling of work activities. The position required knowledge of the pertinent union contract provisions as well as the "ability to motivate and supervise subordinates." [242] Cutrufello stated that his prior experience qualified him for the job, particularly his ramp experience as a Cargo Agent loading and unloading airplanes from 1957 to 1959.[243]

The successful applicant was a forty-two year old Lead Ramp Serviceman at Pittsburgh. TWA's employment records indicate that "[h]is past service and experience prompted decision to select him over runner-up," and that generally he was the most qualified applicant in the eyes of the decision-maker.[244]

### 31 and 32. Operational Controller—Aircraft (JFK)

Plaintiff produced no evidence that Cutrufello applied for these management positions [245] other than Cutrufello's own testimony that he applied for every position in the TWA system. TWA's area personnel manager testified that he could not locate any applications from Cutrufello,[246] and the company's New York-area logbook indicates that Cutrufello did not apply for either position.[247]

Plaintiff adduced no evidence with respect to the ages of the successful applicants. The recipient of the first job was a Senior FIC from Riyadh, Saudi Arabia, and the recipient of the second was an Analyst "B" in Passenger Services at JFK.[248]

### 33. Manager, Cargo Customer Services (JFK)

Plaintiff adduced no evidence that Cutrufello applied for this management position [249] other than his testimony that he applied for every position in the system. TWA's employment records indicate that Cutrufello did not apply for this position.[250] Plaintiff also adduced no evidence that the position was ever filled.

### 34. Field Manager (Oklahoma City)

Cutrufello applied for this management position in August 1977.[251] The position entailed overall supervision of a given shift at the Oklahoma City airport, and required "strong leadership and communication skills." [252] Cutrufello had no management experience with TWA.

This position was filled by two applicants—one a thirty-seven year old Supervisor of Customer Services (Ramp) in San Francisco and the other a fifty year old Supervisor of Customer Services in Oklahoma City.[253] Both had lost their prior management positions in the FORT reorganization and thus were entitled to reassignment. In addition, the Supervisor position that each held was the forerunner of the newly-created Field Manager position.[254]

### 35. Field Manager—Ground Services (Phoenix)

Cutrufello applied for this management position in September 1977 and was subsequently rejected without being inter-

241. DX FK–5, II.

242. PX 242–m.

243. Tr. at 346, 429–30.

244. Tr. at 880; DX II.

245. PX 242–n, 242–p.

246. Tr. at 881, 886.

247. DX FK–5.

248. Tr. at 432–33; DX IJ, IN.

249. PX 242–o.

250. Tr. at 884; DX FK–5.

251. PX 225.

252. *Id. See* note 211 *supra.*

253. DX HN.

254. Tr. at 855–59.

viewed.[255] The position entailed responsibility for overall ramp operations on a given shift.[256] Cutrufello had no previous management experience and was rejected, according to the decision-maker, because he was less qualified than other applicants.[257]

The person chosen from among the approximately forty-five applicants was a forty-two year old Group Supervisor of Sales and Services in Tampa. He received an excellent management performance evaluation from his supervisor, who specifically commended his supervisory and leadership skills.[258]

36. Manager, Cabin Servicing (Los Angeles)

Cutrufello applied for this management position in August 1977.[259] He testified that his prior experience qualified him for the position,[260] although he had never held a management position. The stated qualifications included knowledge of the relevant union contract,[261] which Cutrufello testified he had through his experience as a shop steward.[262]

Plaintiff introduced a letter from Ruocco to Cutrufello stating that approximately eighty qualified TWA employees had applied for this position and that the job required "heavy supervising experience, an area in which you have had little training or experience."[263] Ruocco further advised Cutrufello not to apply for management positions and to concentrate his efforts on obtaining employment at his prior station and department in Philadelphia.

Defendant selected an Acting Group Supervisor of Ramp Services at the Los Angeles airport for this position. He was forty-seven years old at the time.[264]

37. Manager, Ramp and Operations (Los Angeles)

Cutrufello applied for this management position in August 1977.[265] Less than two weeks later Cutrufello was advised by letter that the job opening announcement had been cancelled. He was also told why it had been cancelled.[266]

38. Analyst, Passenger Sales and Services (Albuquerque)

Plaintiff adduced no evidence that Cutrufello applied for this management position[267] other than his own testimony that he applied for every opening in the system. Cutrufello also testified that he was qualified for the position because of his "20 years TWA experience on the ramp and handling personnel and passengers."[268] The position's stated duties included: "Assembl[ing] operations data into meaningful and useful form [for] use by station management."[269] Plaintiff adduced no evidence that this position was ever filled.

39. Ticket Sales Agent (Las Vegas)

Finally, plaintiff adduced no evidence that Cutrufello applied for this position[270] other than his testimony that he applied for

255. PX 228.

256. Id.

257. Id.

258. DX ID.

259. PX 221, 222.

260. Tr. at 343.

261. PX 221.

262. Tr. at 412–13.

263. PX 222.

264. DX IA.

265. PX 220, 222.

266. PX 223 ("When we announced the six manager openings in [Los Angeles] we did not plan to replace Dave Banmiller, Manager of Ramp Services, but it was undecided as to which job he would occupy. Therefore, we opened all of the positions. Dave will remain in the Ramp/Operations function which necessitates the cancellation of the opening.").

267. PX 242–bb.

268. Tr. at 351.

269. PX 242–bb.

270. PX 242–z.

every position in the TWA system. The job involved selling tickets at a city ticket office, although it did not expressly require prior ticket sales experience.[271] Cutrufello, who had little ticket sales experience, testified that his past experience qualified him for the job.[272] Plaintiff did not adduce evidence to show that the job was ever filled.

*George B. Kujawski*

George B. Kujawski, born May 13, 1935, joined TWA in 1966 as a Rate Analyst in the company's New York headquarters. In 1968, he was promoted to Senior Analyst in the Cargo Staff department.[273] In the latter position, Kujawski primarily monitored the sales quotas and marketing plans of various TWA stations and reported thereon to senior management.[274] He was promoted to Military Sales Representative in 1970, which entailed soliciting the military to ship cargo aboard TWA aircraft.[275]

Kujawski held the military sales position until October 1973, when TWA promoted him to Manager, Mail and Express Sales and Services, which he held until August 1976.[276] John F. Murphy, one of the claimants in this action, was Kujawski's supervisor at that time. Murphy then occupied the position of Director of Government Cargo Sales and Services and had previously held the same Manager's job then held by Kujawski.[277] At trial, Murphy testified that he had rated Kujawski's management performance as "very good" in 1974.[278] The management performance evaluation form to which Murphy referred contained an overall evaluation of "3" on a scale of "1" to "6."[279]

In the August 1976 Cargo Staff department reorganization, Murphy assumed Kujawski's responsibilities under the new title of Manager of Government and Military Sales, a demotion for Murphy.[280] At the same time, TWA transferred Kujawski, then forty-one years of age, to the newly-created position of Manager, Cargo Charter Sales. Unlike Murphy, Kujawski was not demoted and did not suffer a cut in pay.[281] In his new position, Kujawski developed a so-called "dedicated aircraft system" to handle cargo charters. This involved establishing a separate aircraft fleet devoted exclusively to cargo chartering and a coordinated soliciting operation. Kujawski had one Staff Analyst reporting to him, Karen Nielsen, who performed the day-to-day operations in the cargo charter sales department.[282]

Because the dedicated aircraft system was a new business endeavor on TWA's part, Charles E. Martin, the Staff Vice President of Cargo Sales and Services, directed Kujawski to conduct a detailed profitability evaluation of the system, which became Kujawski's primary function.[283] In April 1977, Kujawski determined that the dedicated aircraft system was unprofitable and advised Martin accordingly.[284] TWA then discontinued the use of dedicated aircraft and, as a result, eliminated Kujawski's position.[285] TWA continued to use surplus aircraft for charters, however, and Nielsen thus continued to conduct the day-to-day operations in the cargo charter sales department.[286]

271. *Id.*

272. Tr. at 342.

273. Tr. at 165–66; PX 62, 63.

274. Tr. at 166.

275. Tr. at 166–68; PX 62, 63.

276. PX 62, 63.

277. Tr. at 172–73, 244–45, 271–72.

278. Tr. at 272.

279. PX 65.

280. Tr. at 177, 246–47.

281. Tr. at 176; PX 62, 63.

282. Tr. at 178–82.

283. Tr. at 179–81, 211.

284. Tr. at 180, 211.

285. Tr. at 179–81, 211–14.

286. Tr. at 212.

After TWA eliminated Kujawski's position, it transferred him to the position of Manager, Interline and Intermodal Sales.[287] At the time, Martin told Kujawski that although he was disappointed in the failure of the dedicated aircraft system, he was satisfied that Kujawski had done a good job.[288] And in a management performance evaluation completed in April 1977, Kujawski's direct supervisor, Galbie D. Robinson, stated that Kujawski "has not achieved what was desired for reasons beyond his control." Kujawski received an overall rating of "4" in that evaluation.[289]

After Kujawski left the position of Manager, Cargo Charter Sales, the volume of charter sales increased even though only Karen Nielsen remained involved in cargo charter sales.[290] Kujawski testified that the reasons for this increase included the withdrawal of a competitor from one aspect of the business and the ability of TWA to "establish a credibility in the marketplace with the freight forwarders that TWA was actively seeking cargo charters."[291] Kujawski further testified that although he was involved in "establishing credibility," it was Nielsen who "[b]asically ... developed that."[292]

After Kujawski assumed the position of Manager, Interline and Intermodal Sales, the sales volume of that department increased fourfold.[293] Nevertheless, in November 1977, Robinson told Kujawski that TWA intended to terminate him. Shortly thereafter, Martin advised Kujawski that his latest position would be eliminated due to a reduction-in-force, not because of inadequate performance on Kujawski's part.[294] At the same time, Martin offered Kujawski a position as an Analyst in Kansas City. Although there may have been no salary reduction, Kujawski rejected Martin's offer and left TWA in January 1978.[295]

In November 1977, at about the same time Martin informed Kujawski that his position would be eliminated in a reduction-in-force, TWA upgraded Nielsen's Analyst position to a Manager's position.[296] Pursuant to company policy and procedures, such an upgrading did not result in an opening for which others within the TWA system could apply.[297] Ann Anderson testified that she was familiar with the relevant company policies in this area.[298] She further testified as follows:

Q If you had an analyst position that was reevaluated and as part of that reevaluation upgraded to a manager's position, would that new manager's position be considered an open position which might be filled by a manager who had lost his job in a force reduction?

A No. When a position is reevaluated, providing there is an incumbent in the position at the time, for example, if an analyst position is reevaluated to a manager position, the person who is doing the work of that analyst, the analyst—the person in the analyst job would become the manager.

Q That analyst moves up to that manager's position with the same function because of the reevaluation?

A Exactly.

Q That would not be a new position that would be open for someone whose job—

A Right, it is a reevaluation.

. . . .

THE COURT: When the classification is changed in the manner in which you have indicated from analyst to manager, is there any posting?

287. Tr. at 211–12.

288. Tr. at 182, 212.

289. PX 66.

290. Tr. at 214.

291. Tr. at 191.

292. Tr. at 193.

293. Tr. at 195–96.

294. Tr. at 186–87, 197.

295. Tr. at 216–17, 224.

296. PX 164.

297. Tr. at 989–92.

298. Tr. at 988–89.

THE WITNESS: No.[299]

Martin explained his decision to reevaluate and upgrade Nielsen's position to Manager in a memorandum to R. A. Fisk dated November 11, 1977:

The positions of Manager Cargo Charter Sales and Staff Analyst Cargo Charters were created during my reorganization toward the end of 1976. Effective 3/15/77 the position of Manager Charter Sales was eliminated due to lack of success in selling charters and the individual and the aircraft were both redeployed. In conjunction with the above change we left the total cargo charter responsibility, including sales, with the staff analyst position since we assumed that with only layover aircraft to sell the position was basically administrative and didn't require higher level attention. Our analysis has proven incorrect manyfold as evidence [sic] by the statistics below:

| MONTH | REVENUE |
| --- | --- |
| April | 363,738 |
| May | 406,875 |
| June | 459,911 |
| July | 759,345 |
| August | 1,098,271 |
| September | 1,100,000 |
| October | 1,600,000 |

This revenue has been generated strictly with layover aircraft and primarily through the efforts of the Staff Analyst Karen Neilsen [sic]. The position has now become much more important and critical than the combined jobs that existed prior to April.

[W]e are providing Karen some temporary help now and later intend to justify an additional position. I am convinced that the scope of the position Karen is now in has expanded substantially as has her responsibility. I would like you to review the attached Management Position Description as soon as possible and I recommend that the position be upgraded

to Manager Level 67 reporting to Phil Moore.[300]

Fisk adopted Martin's recommendation, and the position was upgraded to Manager, Cargo Charter Sales.[301] Nielsen was then thirty-four years of age.[302]

Plaintiff elicited testimony from Anderson on cross-examination that rather than upgrading the Analyst's position to Manager, Martin could have recreated the Manager's position formerly held by Kujawski, and that this would have created an opening.[303] Plaintiff did not, however, adduce any evidence that a second position in the cargo charter sales department, other than the newly upgraded Manager's position, was ever created. Plaintiff also adduced no evidence to show that a net reduction-in-force was not accomplished when Kujawski's position as Manager, Interline and Intermodal Sales was eliminated and Nielsen's position was reevaluated and upgraded.

*Vito A. Angerame*

Vito A. Angerame, born February 21, 1927, joined TWA in 1945 as a Cargo Handler at LaGuardia. He served as a Transportation Agent and Lead Transportation Agent from 1947 to 1959 at LaGuardia and JFK. In 1959, he became a Sales Representative at defendant's Manhattan headquarters and received a promotion to Senior Sales Representative in 1960. In 1962, he was again promoted, to Sales Manager—Air Freight. He left TWA in 1964 to enter private business but returned in 1966 as an Account Executive in the Cargo Staff department. In 1968, at age forty-one, he received a promotion to Manager, Air Freight Sales, the title of which was changed in 1971 to Manager, Forwarder/Agency Sales. Angerame became Manager, Forwarder Sales in the Government Cargo Marketing department in 1973 and was promoted to Manager, Cargo Sales in 1975 in the City Cargo Sales depart-

**299.** Tr. at 989–92.

**300.** DX FM–1.

**301.** *Id.*; Tr. at 992.

**302.** PX 164.

**303.** Tr. at 1001.

ment.[304] In the latter position, Angerame's principal responsibility was to generate sales in the New York region, and he serviced approximately 1000 accounts.[305]

Angerame's supervisor when he held the Manager, Forwarder Sales position, testified that Angerame's performance was excellent.[306] In December 1975, Donald A. Adley, who had promoted Angerame to the Manager, Cargo Sales position,[307] rated Angerame's overall performance a "6" on a scale of "1" to "6." Adley commented that Angerame was "demanding" and "hard nosed" and that he "tend[ed] to become impatient when standards are not met and commitments are unsatisfied." Nevertheless, Adley was effusive in his praise of Angerame's "results oriented" and successful approach to increasing sales volume.[308]

In December 1976, Adley fired Angerame, then forty-nine years old.[309] Angerame testified that Adley gave only one reason for dismissing him—that Angerame had "go[ne] over his head" to Adley's supervisor, H. W. Cox, despite Adley's prior warning not to do so. He also testified that Adley had never warned him personally not to go over his head but that Adley had made that known generally.[310] Finally, Angerame testified that he was never told that the company was dissatisfied with his performance.[311]

Adley, who left TWA in 1977, testified that he made the decision to fire Angerame,[312] and that Angerame's age had no bearing on that decision.[313] When asked why he fired Angerame, Adley testified as follows:

A Primary reason was performance. Mr. Angerame failed to meet his standards and objectives for the period of time in year 1976.

Q When you say "his standards and objectives," what do you mean by that?

A He was in charge of sales and responsible for revenue generation for the New York region. And in that particular area of responsibility, he's required to meet specific revenue goals on a month-to-month basis. Those goals were not effectively met.

Q For what year?

A For the year 1976.

Q You said that was the primary reason for his termination?

A That's correct.

Q Were there other reasons?

A Yes. There was a secondary reason, and it concerned management activity and his style of management. In this particular instance, there was tremendous pressure on all management people in the region at that time to perform, and I think based upon that pressure, at a given point, he went to the vice president of the region indicating that he was not able to meet his performance standards due to ineffective or inefficient operations in other functional areas in the region, primarily in the service and operations ar-

---

**304.** PX 243, 244.

**305.** PX 243–a at 15–17 (deposition of Vito A. Angerame) [hereinafter "Angerame Deposition"].

**306.** PX 243–c at 31–34 (deposition of Michael Neville).

**307.** Tr. at 827; Angerame Deposition at 79.

**308.** PX 253.

**309.** Tr. at 825.

**310.** Angerame Deposition at 31–33, 40–41.

**311.** *Id.* at 75–76. Adley testified that he informed Angerame that he was being fired for poor performance. Tr. at 831.

**312.** Tr. at 825.

**313.** Tr. at 827–28. Less than two years earlier, Adley had made the decision to promote Angerame to the Manager, Cargo Sales position. Tr. at 827; Angerame Deposition at 79. Angerame was then forty-seven. In his deposition, Angerame conceded that Adley did not hold his age against him at that time. *Id.* He also testified that Adley "called me and asked me whether I filed an age discrimination case. And if I didn't, perhaps I should." *Id.* at 81. Adley flatly denied ever having talked with Angerame regarding whether he filed an age discrimination charge. Tr. at 827.

eas. That in fact was not true. And essentially what he had attempted to do was to generate blame in other areas of the operation protecting himself. Unfortunately, that incident cost him the confidence and trust of the peers that he had to work with, and as a member of the management team in that region, he did himself a disservice and provided himself with serious difficulties with effectively functioning with that group on a continuing basis.

Q So you decided that he was no longer able to continue in that function?

A That's correct.[314]

Adley further testified that Angerame had met his sales goals in 1975, and documentary evidence established that total sales revenues in Angerame's department increased slightly from 1975 to 1976.[315] But Angerame acknowledged that he fell $2.4 million short of his sales goal in 1976,[316] and Adley testified that taking into account other factors, such as rate increases, Angerame's productivity was actually worse than the raw figures indicated.[317] Adley denied that other factors, such as revised interpretations of rate regulations or operational problems, had any effect on Angerame's ability to meet his sales quota.[318]

Jeff L. Warner, age thirty-one, replaced Angerame as Manager, Cargo Sales.[319] Warner had previously held several positions in the marketing department ·at TWA headquarters and was Manager, Sales and Services Budgets at the time of his selection. In his most recent management performance evaluation, Warner received an overall rating of "5," and his supervisor stated: "I rate Jeff as one of the most capable and versatile employees within the company. He is ranked No. 1 in the department and considered the best candidate for promotion."[320]

## DISCUSSION

Section 4(a) of the ADEA makes it "unlawful for an employer to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's age." 29 U.S.C. § 623(a)(1). Having alleged such treatment of the six claimants still involved in this case, plaintiff has the burden of proving that defendant intentionally discriminated against these claimants because of their age.

■ Initially, plaintiff has the burden of establishing by a preponderance of the credible evidence a prima facie case of discrimination. If plaintiff is successful, defendant must then articulate some legitimate, nondiscriminatory reason for the challenged employment decision. If defendant does so, plaintiff must prove that the reason offered by defendant was actually a pretext for discrimination. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981) ["*Burdine*"]; *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973) ["*McDonnell Douglas*"]. As pointed out recently by the Supreme Court, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the [claimant] remains at all times with the plaintiff." *Burdine, supra*, 450 U.S. at 253, 101 S.Ct. at 1094.[321] In the instant action, plaintiff's

---

314. Tr. at 825–27.

315. Tr. at 827; PX 250.

316. Angerame Deposition at 92. Angerame achieved 94% of his sales goal. PX 250.

317. Tr. at 829–30.

318. Tr. at 830–31.

319. Tr. at 752.

320. DX FO.

321. This method of proof is applicable to cases arising under the ADEA. *See Stanojev v. Ebasco Services, Inc.*, 643 F.2d 914, 920 & n.4 (2d Cir. 1981); *Geller v. Markham*, 635 F.2d 1027, 1032, 1034–35 (2d Cir. 1980); *Smith v. Flax*, 618 F.2d 1062, 1066 n.3 (4th Cir. 1980); *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1010 & n.3 (1st Cir. 1979).

ultimate burden is to show that age discrimination "was a causative or determinative factor, one that made a difference" in making the challenged employment decisions. *Geller v. Markham*, 635 F.2d 1027, 1035 (2d Cir. 1980); *accord, Parcinski v. Outlet Co.*, 673 F.2d 34, 36 (2d Cir. 1982); *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1019 (1st Cir. 1979).

■ A prima facie case of discrimination can be established in different ways, depending on the factual situation. *See Burdine, supra*, 450 U.S. at 253 n.6, 101 S.Ct. at 1094 n.6; *McDonnell Douglas, supra*, 411 U.S. at 802 n.13, 93 S.Ct. at 1824 n.13. For purposes of the claims of Rooney, McFall, Murphy and Cutrufello, all of whom were allegedly denied promotions, transfers or reassignments, plaintiff must show that (1) the claimant was a member of the protected age group—that is, between forty and seventy years of age;[322] (2) the claimant applied for but did not receive the particular position at issue; (3) another person of similar qualifications, generally outside the protected age group, received the contested position; and (4) the claimant was qualified to fill the position he sought. *Ford v. General Motors Corp.*, 656 F.2d 117, 118 n.2 (9th Cir. 1981); *accord, Valentino v. United States Postal Service*, 674 F.2d 56, 63 (D.C. Cir.1982); *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C.Cir.1981).

■ With respect to Kujawski and Angerame, who were terminated, plaintiff must prove that (1) the claimant was a member of the protected group; (2) he was terminated; (3) he was replaced with a person outside the protected group; and (4) he was qualified to continue in the job. *See Price v. Maryland Casualty Co.*, 561 F.2d 609, 612 (5th Cir. 1977); *accord, Douglas v. Anderson*, 656 F.2d 528, 532–33 (9th Cir. 1981); *Stanojev v. Ebasco Services, Inc.*, 643 F.2d 914, 919–20 (2d Cir. 1981) ["*Stano-*

*jev*"]; *Loeb v. Textron, Inc., supra*, 600 F.2d at 1013–14. Kujawski's position was eliminated in a reduction-in-force, and he therefore was not replaced. Accordingly, the last two elements of a prima facie case may be modified as follows: (3) the claimant was qualified to assume another position at the time of the discharge; and (4) there is some other evidence from which an inference of discrimination can reasonably be drawn. *See Baldwin v. Sears, Roebuck & Co.*, 667 F.2d 458, 462 (5th Cir. 1982); *Williams v. General Motors Corp.*, 656 F.2d 120, 129 (5th Cir. 1981), *cert. denied*, —— U.S. ——, 102 S.Ct. 1439, 71 L.Ed.2d 655 (1982); *Franci v. Avco Corp.*, 538 F.Supp. 250, 256 (D.Conn.1982); *Deutsch v. Carl Zeiss, Inc.*, 529 F.Supp. 215, 217–18 (S.D.N.Y.1981). In a reduction-in-force case, the last element requires that plaintiff produce direct or circumstantial evidence that would lead a "reasonable fact-finder to conclude either … that defendant consciously refused to consider retaining or relocating [the claimant] because of his age, or … [that] defendant regarded age as a negative factor in such consideration." *Franci v. Avco Corp., supra*, 538 F.Supp. at 256; *see Williams v. General Motors Corp., supra*, 656 F.2d at 129–30.[323]

■ Two of the elements of a prima facie case of age discrimination require further elaboration. *First*, contrary to the holdings of some cases, *see, e.g., Price v. Maryland Casualty Co., supra*, 561 F.2d at 612, the person who replaces the allegedly aggrieved employee need not always be under forty years of age. There is no logical reason why an inference of discrimination cannot be drawn when the replacement is younger but not outside the protected group, particularly in view of the fact that the protected group spans two generations. *See Douglas v. Anderson, supra*, 656 F.2d at 533; *Loeb v. Textron, Inc., supra*, 600 F.2d at 1012–13 &

---

**322.** *See* 29 U.S.C. § 631(a).

**323.** As the Supreme Court observed in *Burdine*, the prima facie case "eliminates the most common nondiscriminatory reasons for the [claimant's] rejection," *Burdine, supra*, 450 U.S. at 254, 101 S.Ct. at 1094, namely, "an absolute or

relative lack of qualifications or the absence of a vacancy in the job sought," *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 358 n.44, 97 S.Ct. 1843, 1866 n.44, 52 L.Ed.2d 396 (1977).

n.9; *Moore v. Sears, Roebuck & Co.*, 464 F.Supp. 357, 364–66 (N.D.Ga.1979) ["*Moore*"]. "[A]ge is a relative rather than absolute status when taken as a basis for discrimination," *Moore, supra*, 464 F.Supp. at 366; thus, differential treatment on the basis of age—plaintiff's ultimate burden, *see Stanojev, supra*, 643 F.2d at 921—can be inferred when the replacement employee is younger than the aggrieved employee but within the protected group.

■ On the other hand, the Court believes that the smaller the difference in age between the two employees, the weaker the inference of discrimination. As the age differential narrows, the Court will necessarily require stronger alternative proof before making a finding that plaintiff has established a prima facie case of age discrimination. *See Douglas v. Anderson, supra*, 656 F.2d at 533; *Loeb v. Textron, supra*, 600 F.2d at 1013 n.9; *Pace v. Southern Railway System*, 530 F.Supp. 381, 385 (N.D.Ga.1981). "In each case the [Court] must determine whether the evidence identifies age as the likely reason for the discharge." *Douglas v. Anderson, supra*, 656 F.2d at 533.[324]

■ *Second*, with respect to proof of the claimant's qualifications either to fill the position sought, to continue in his present position, or to assume another position at the time of a reduction-in-force, the testimony of the employee himself carries little weight. *See Ford v. General Motors Corp., supra*, 656 F.2d at 119; *cf. Smith v. Flax*, 618 F.2d 1062, 1067 (4th Cir. 1980) (the employee's perception of himself is not relevant). The most probative evidence of qualifications comes from the decision-maker, *see Smith v. Flax, supra*, 618 F.2d at 1067, although the Court sees no reason why it should not consider any evidence bearing on the employee's qualifications to hold a particular job. Thus, the employee's perception of himself, although weak, is probative if corroborated by other evidence, documentary or otherwise, derived from the decision-maker. In short, plaintiff must prove that each claimant possessed both the minimum qualifications and whatever additional qualifications defendant indicated were "necessary or preferred." *Aikens v. United States Postal Service Board of Governors*, 665 F.2d 1057, 1059 (D.C.Cir.1981), *cert. granted*, —— U.S. ——, 102 S.Ct. 1707, 72 L.Ed.2d 132 (1982).

■ A defendant's burden to rebut the presumption of discrimination created by a prima facie case is satisfied "by producing evidence that the [claimant] was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason.... It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated .... To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the [claimant's] rejection." *Burdine, supra*, 450 U.S. at 254–55, 101 S.Ct. at 1094–95 (footnote omitted). The employer "need not persuade the court that it was actually motivated by the proffered reasons." *Id.* at 254, 101 S.Ct. at 1094. Moreover, the actual decision-maker need not testify as to what he did and why he did it. Rather, "the employer need only produce admissible evidence which would allow the [Court] rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Id.* at 257, 101 S.Ct. at 1095; *accord, Valentino v. United States Postal Service, supra*, 674 F.2d at 63; *Knight v. Nassau County Civil Service Commission*, 649 F.2d 157, 161 (2d Cir.), *cert. denied*, 454 U.S. 818, 102 S.Ct. 97, 70 L.Ed.2d 87 (1981).

---

**324.** At least two courts have stated that a prima facie case is not conclusively foreclosed even if the replacement is older than the aggrieved employee. *See Douglas v. Anderson, supra*, 656 F.2d at 533; *Loeb v. Textron, Inc., supra*, 600 F.2d at 1013 n.9. Although this Court agrees, only if there is other highly probative evidence from which an inference of discrimination can be drawn—such as proof that the replacement was hired to ward off a threatened age discrimination suit—will the Court find that plaintiff has carried its initial burden when the replacement employee is older than the claimant. In the absence of such proof, it is extremely unlikely that age was the basis of the employment decision.

██ One further observation is necessary with regard to a defendant's burden to rebut a prima facie case. The employer need not prove that the person hired or promoted instead of the claimant was the more qualified of the two. An employer is entitled to misjudge the qualifications of applicants for a particular job, so long as its choice is not based on impermissible criteria. *Burdine, supra*, 450 U.S. at 258–59, 101 S.Ct. at 1096–97. This Court agrees with the First Circuit that "when a management level job is involved . . . an employer is entitled to make its own subjective business judgments, however misguided they may appear." *Loeb v. Textron, Inc., supra*, 600 F.2d at 1019. "In other words, the employer has the 'prerogative to be shortsighted and narrowminded.' " *Stanojev, supra*, 643 F.2d at 922 (quoting *Drown v. Portsmouth School District*, 435 F.2d 1182, 1186 (1st Cir. 1970), *cert. denied*, 402 U.S. 972, 91 S.Ct. 1659, 29 L.Ed.2d 137 (1971)).

██ If the employer has articulated a legitimate reason for the challenged employment decision, the plaintiff must establish that the proffered reason is in truth a pretext for discrimination. *See Burdine, supra*, 450 U.S. at 256, 101 S.Ct. at 1095. This may be accomplished "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* The reasonableness or lack thereof of the employer's explanations is probative in this regard. *See Loeb v. Textron, Inc., supra*, 600 F.2d at 1012 n.6. Thus, "[t]he more idiosyncratic or questionable the employer's reason, the easier it will be to expose it as pretext." *Id.* For example, evidence that the claimant was consid-

erably more qualified for the contested position than the person selected would be probative of pretext because it is unlikely that an employer would exercise its good faith business judgment in such a manner. *See Aikens v. United States Postal Service Board of Governors, supra*, 665 F.2d at 1059–60; *Lieberman v. Gant*, 630 F.2d 60, 67–68 (2d Cir. 1980). Conversely, the lack of a significant discrepancy between the qualifications of the claimant and the successful applicant would not be probative of pretext because an employer may choose from among several qualified candidates without violating the ADEA. *See Burdine, supra*, 450 U.S. at 259, 101 S.Ct. at 1097; *Murphy v. Middletown Enlarged City School District*, 525 F.Supp. 678, 693, 707 (S.D.N.Y.1981). Another example of pretext would be if the employer claimed it did not select an employee for a particular position because its records indicated he had not applied, and plaintiff adduced credible evidence that the employee did apply.

With the foregoing principles in mind, the Court now turns to the specific claims of the six employees.

*James A. Rooney*

Initially, the Court notes that Rooney tended to exaggerate the diversity of his qualifications.[325] This is not to say that Rooney's testimony was not credible in its entirety. With respect to the types of positions he occupied during his TWA tenure, his testimony was credible because it was substantially corroborated by Ossler and by his personnel records. On the other hand, Ossler admitted that he had not supervised Rooney long enough to make a formal evaluation of his management performance, which tends to lessen the weight of Ossler's testimony.

---

**325.** For example, Rooney stated that he applied for two positions requiring a law degree and a bachelor or science degree in engineering, respectively, but that he had neither degree. Tr. at 680–81. Plaintiff did not contest Rooney's rejection for these two jobs. Rooney also testified with respect to his qualifications for two positions which plaintiff does not address in its post-trial submissions and thus has apparently decided not to contest. One position required a business related degree, PX 309; Rooney does

not have such a degree. The other position required "formal training and/or experience in accounting/economics/finance." PX 308. Rooney claimed he was qualified for the position based on his personal finance experience, *see* note 7 *supra*, acknowledging, however, that he did not have formal training in these areas. Tr. at 655–57. Defendant selected a certified public accountant for the latter position. Tr. at 914–15.

Moreover, the Court finds that the fact that Rooney applied for more than fifty promotions yet is now only contesting four rejections indicates that Rooney does not believe he was discriminated against in the remaining forty-six. Indeed, at trial, plaintiff offered evidence as to eight rejections, and has since abandoned four. Two were abandoned during trial because the pertinent job postings were cancelled and never filled.[326] Two others were abandoned after trial, apparently because Rooney's testimony demonstrated that he was not qualified.[327] The foregoing clearly favors defendant.

Finally, Rooney received several requested lateral transfers and promotions after he reached the age of forty. The Court finds this to be probative at least of an absence of a TWA policy to discourage the career prospects of its older employees. The Court recognizes, of course, that this evidence does not prove that in the specific instances at issue defendant did not discriminate on the basis of age.

■ With respect to the position of Senior Analyst, Rate Proceedings (Kansas City), plaintiff satisfied the first two elements of a prima facie case. But plaintiff produced no evidence showing that the job was ever filled. Plaintiff's counsel stated at trial that plaintiff requested production of any documents relating to who filled this job but that defendant was "not able to find any [such] records."[328] Normally, if the party in control of certain evidence fails to produce that evidence, the Court may draw an inference that that evidence is "unfavorable" to that party. *Tupman Thurlow Co. v. S.S. Cap Castillo*, 490 F.2d 302, 308 (2d Cir. 1974). In this case, the "unfavorable" inference would be that this evidence would establish that the position was filled by someone younger than Rooney. Without the aid of such an inference, plaintiff cannot sustain its burden of proving a prima facie case as to this job.

■ In light of all the circumstances of this case, the Court declines to draw the suggested inference. As far as the Court is aware, defendant at no time failed to produce discoverable records. Indeed, the evidence in this case was voluminous and included employment records for dozens of jobs, all of which were produced without objection by defendant. In short, the Court finds that these records were not produced because they did not exist, not because they contained unfavorable evidence.

■ Moreover, the most likely explanation for the absence of such records is that the position was never filled. If it had been filled, as in the case of the numerous other contested positions, the job file would likely have contained records relating to the various applicants and the recipient. Indeed, the job opening announcements relating to at least two positions for which Rooney initially sought relief and which were the subject of evidence introduced by plaintiff at trial, turned out to have been cancelled, leaving the positions unfilled. It is not difficult to envision that when a job opening announcement is withdrawn the file may appear incomplete and not contain conclusive evidence that the position was in fact cancelled. Accordingly, having failed to establish that the position was filled, plaintiff failed to make out a prima facie case.[329]

■ Plaintiff established a prima facie case with respect to the other three contested positions.[330] The Court finds, however,

---

**326.** Tr. at 833; PX 307, 310.

**327.** PX 308, 309. *See* note 325 *supra*.

**328.** Tr. at 752.

**329.** Plaintiff correctly observes that it need not show that the position was filled by someone outside the protected age group, citing *Loeb v. Textron, Inc., supra*, 600 F.2d at 1012–13 & n.9. *See* Plaintiff's Proposed Findings of Fact and Conclusions of Law at 80 (filed Dec. 21, 1981).

But by this argument plaintiff overlooks its burden to show that the position was in fact filled. Not having done so, it cannot make out a prima facie case.

**330.** Plaintiff established that Rooney was qualified for the Supervisor, Customer Services (Phoenix) position, albeit weakly. Although the position required "in depth knowledge of all functions of customer service," Rooney last had a customer service function at an airport

that defendant articulated legitimate reasons for Rooney's rejection in each case, which at the least raised questions of fact as to whether it discriminated. Thus, defendant successfully rebutted plaintiff's prima facie case.

As to the position of Supervisor, Customer Services (Phoenix), Rooney's most recent customer service experience was in 1960, which was reflected in Rooney's employment records. In contrast, the successful applicant held a nearly identical position for the previous six years and had a better management performance evaluation than Rooney. Moreover, the decision-maker advised Rooney that he had decided to interview those employees whose background indicated they were best qualified.

The position of Staff Analyst, Cargo Marketing (New York City) required cargo field sales experience and finance experience. Rooney's employment records shows that he had no cargo sales experience in a field position. He also lacked any job-related finance experience and whatever personal finance experience he had was not reflected in the records. The successful applicant had current cargo field sales and finance experience. Moreover, the credible testimony of Ann Anderson, a TWA personnel administrator, established that a review of both these applicants' employment records revealed that the successful applicant was better qualified. Plaintiff's argument that Anderson's testimony was "not competent" misconstrues the nature of defendant's burden. Clearly, defendant produced admissible evidence from which the Court could rationally conclude that Rooney was not rejected because of his age. *See Burdine, supra.* 450 U.S. at 257, 101 S.Ct. at 1095.

Finally, although the decision-maker for the final contested position—Supervisor, City Ticket Offices (Kansas City)—acknowledged that Rooney was qualified,[331] Rooney was not selected. The position required that the applicant be "sales and/or

marketing oriented," and the successful applicant occupied just such a job in Kansas City at that time, soliciting ticket sales in the Kansas City area. Rooney's employment records did not reflect any job experience related to city ticket offices, and in fact Rooney admitted that his experience in this area was limited to transactions as a customer of TWA. In short, while TWA might have made an error in business judgment in not selecting Rooney, defendant's evidence clearly raises at least a question of fact on the issue of discrimination and thus rebuts the inference of discrimination.

Defendant having carried its intermediate burden to rebut plaintiff's prima facie case, plaintiff must establish that defendant's proffered reasons were a pretext for discrimination. Plaintiff, however, adduced no direct evidence that "a discriminatory reason more likely motivated" defendant, and the Court finds defendant's explanations to be both reasonable and credible. *Burdine, supra,* 450 U.S. at 256, 101 S.Ct. at 1095, *Loeb v. Textron, supra,* 600 F.2d at 1012 n.6. Rather than demonstrating that Rooney's qualifications were superior to those of the selected applicants, the evidence established that at best Rooney was equally qualified only with respect to the final contested position, and defendant is entitled to choose from among qualified candidates. *See Burdine, supra,* 450 U.S. at 259, 101 S.Ct. at 1097. As to the other positions, the Court finds that the selected applicant was more qualified. Thus, plaintiff has not nearly established pretext and thus has not carried its ultimate burden of persuading the Court that defendant's employment decisions were made on the basis of age.

*Maxwell McFall*

■■■ Plaintiff established a prima facie case of age discrimination with respect to the three positions at issue—McFall was in the protected age group, he applied and was

---

seventeen years earlier. Similarly, plaintiff barely established Rooney's qualifications for the position of Staff Analyst, Cargo Marketing (New York City). The evidence showed that whatever cargo field sales experience Rooney

had was not reflected in his employment records.

**331.** PX 311.

rejected for each of the positions, the successful applicants were under forty years of age, and McFall was qualified to hold the three positions.[332] The Court finds, however, that defendant rebutted the prima facie case by articulating legitimate nondiscriminatory reasons for McFall's rejections, and that plaintiff failed to demonstrate that defendant's explanations were pretext for discrimination.

Defendant produced credible evidence that although McFall had held the Manager, Cargo Sales and Services (St. Louis) position previously, the successful applicant was also eminently qualified to hold the position. At the time of his selection, he was Acting Manager of the position, he reported directly to the decision-maker for the contested position, and he had been highly praised by the prior occupant of the position. Because defendant need not convince the Court that its choice was the best, but need merely adduce evidence from which the Court can rationally conclude that the employer was not motivated by age animus, see Burdine, supra, 450 U.S. at 257, 101 S.Ct. at 1095, defendant carried its intermediate burden.

With respect to the second position—General Manager, Cargo Sales and Services (JFK)—defendant's evidence showed that the successful applicant received the highest possible appraisal—an overall "6"—on his most recent management performance evaluation, whereas McFall received the second highest appraisal. In addition, the person who evaluated the recipient reported directly to the decision-maker, indicating that the latter was personally aware of the recipient's qualifications. Moreover, the decision-maker notified McFall that he was rejected because he was not as qualified as other applicants. In short, defendant's articulated explanation for McFall's rejection

was that he was not the most qualified. This evidence clearly rebuts plaintiff's prima facie case under Burdine.

Finally, defendant's evidence showed that McFall's application for the Supervisor, Customer Services (Tulsa) position included his March 1977 management performance evaluation, which reflected the fact of his recent demotion in August 1976. In addition, McFall's appraisal had declined from a "5" overall to a "4" overall, and he was rated at "4" in nearly every other category as well. Moreover, the successful applicant was performing the same type supervisory responsibilities at the time, while McFall's last similar position was twelve years earlier and he was last stationed at an airport in 1972. The Court finds that defendant's articulated reasons thereby satisfied its intermediate burden under Burdine.

In its post-trial submissions, plaintiff makes no attempt to argue that the evidence adduced at trial established that defendant's proffered reasons for McFall's rejections were in truth pretext for discrimination. Indeed, the evidence established just the opposite. McFall's qualifications, while substantial, were not demonstrably superior to those of the successful applicants. In addition, he received a promotion at age forty-six, a year after his demotion and only months after he was allegedly rejected for the Supervisor's position in Tulsa on the basis of his age, and he subsequently received a requested transfer. Plaintiff failed to adduce any evidence that defendant made these employment decisions as part of some effort to mask its previously discriminatory conduct.[333] In short, plaintiff has not proved that age played any role whatsoever in the challenged employment decisions.

**332.** Plaintiff's prima facie case with respect to the third position—Supervisor, Customer Services (Tulsa)—is weak. McFall's recent demotion was reflected in the management appraisal submitted with his application and he was most recently stationed at an airport five years earlier. The other evidence established that he was qualified for this position, but only minimally so.

**333.** Moreover, McFall allegedly applied for approximately forty positions during this time period, yet he seeks relief only with respect to three. This evidence is further support for defendant's position that it did not base its employment decisions on the claimant's age.

*John F. Murphy*

Murphy applied for three director positions at TWA headquarters shortly after the August 1976 Cargo Staff reorganization. The Court finds that the evidence adduced by plaintiff established a prima facie case of age discrimination with respect to each. Again, however, defendant successfully rebutted plaintiff's prima facie case in each instance, and plaintiff failed to show pretext.

As to all three positions, the decision-maker, Charles Martin, testified that he believed that Murphy's experience, while substantial in terms of length of service, was limited in scope to mail and military operations. Martin stated that the recipient of the position of Director, Cargo Services, was selected because he was more qualified than Murphy—he had a wider range of experience and more current experience related to this particular job. Martin further testified that he selected the recipient of the Director, Cargo Marketing position because the latter's experience was more current and more closely related to this particular job. Finally, Martin testified that he chose an applicant for Director, Cargo Sales position who not only had better and more current experience, but who also had personal knowledge of the problems that might arise and thus "knew what needed to be done." The Court finds that this evidence easily satisfies defendant's burden to articulate legitimate nondiscriminatory reasons for Murphy's rejections.

As to plaintiff's burden to establish pretext, the Court finds that while Martin may have overstated Murphy's lack of qualifications, his testimony was generally credible. Martin's decisions appear to the Court to constitute no more than the good faith exercise of his business judgment, which is not to say that the Court necessarily agrees with those decisions. The point is that the Court will not interfere with those decisions absent evidence that the decisions were made on the basis of age. The only reasonable conclusions that can be drawn from the evidence adduced are that (1) while the recipients and Murphy were in some respects equal in qualifications, each of the recipients was arguably more qualified, (2) there is no direct evidence of age discrimination, and (3) there is no reason to doubt Martin's overall credibility.[334] In short, plaintiff has not demonstrated that Martin's decisions were pretext for discrimination and its claims on behalf of Murphy must therefore fail.

*Roger Cutrufello*

Initially, the Court finds that Cutrufello's testimony with respect to his qualifications and whether he applied for certain job openings was generally not credible. Under oath, Cutrufello boasted that he was qualified for every position in the TWA system except pilot. He testified that he was qualified for jobs requiring good communication skills, yet wrote a letter to a company personnel manager while seeking reassignment after his return from Saudi Arabia that is practically illiterate.[335] He applied for numerous management positions around the country, even though he had been advised in view of his background to concentrate his efforts on nonmanagement jobs in the Philadelphia area. In fact, Cutrufello applied for not one job opening in Philadelphia. Finally, plaintiff contests only thirty-nine jobs, although Cutrufello claimed he applied for 200.[336]

---

**334.** The Court also notes that Murphy received a promotion from Manager to Director, two years prior to the events at issue, when he was forty-five. This also supports the Court's conclusion that defendant's employment decisions were not made on the basis of Murphy's age.

**335.** *See* note 211 *supra*.

**336.** In its post-trial submissions, plaintiff claimed that Cutrufello was "qualified for at least forty of the positions for which he applied." Plaintiff's Proposed Findings of Fact and Conclusions of Law at 90 (filed Dec. 21, 1981). In a pretrial brief, however, plaintiff stated that "although Mr. Cutrufello was not qualified for all the jobs for which he applied, he was qualified to hold at least *twenty* of those jobs." Memorandum in Points of Law at 13 filed May 27, 1981) (emphasis in original). Plaintiff's inconsistency reflects poorly on Cutrufello's credibility with respect to his qualifications.

Moreover, evidence indicates that Cutrufello did not submit applications nearly as often as he claimed. Although he said he applied for 200 positions, plaintiff produced acknowledgment letters or the equivalent relating to only twelve jobs still under contention.[337] Indeed, plaintiff makes the incongruous argument that because it produced such letters for a few of the contested jobs, it is probable that Cutrufello applied for all the contested jobs. On the contrary, the Court believes that the proper inference to draw from this and the other evidence in the case [338] is that if an acknowledgment letter does not exist, Cutrufello probably did not apply. Plaintiff also argues that the evidence defendant adduced did not establish that Cutrufello failed to apply for certain jobs. This argument, however, seeks to shift the burden of proof from plaintiff to defendant. Although defendant's evidence in this area was incomplete, the incompleteness of *plaintiff's* evidence is considerably more probative.

██ The Court finds that plaintiff failed to make out a prima facie case with

respect to most of the positions still in contention. Defendant's documentary and testimonial evidence, contradicted only by Cutrufello's testimony, which the Court finds not credible, demonstrates that Cutrufello never applied for seventeen jobs.[339] In addition, plaintiff did not adduce any evidence that one of these seventeen positions was ever filled,[340] and with respect to two others, the successful applicants were the same age or older than Cutrufello.[341]

Cutrufello specifically testified that he applied for three other jobs, but plaintiff produced no evidence to corroborate Cutrufello's assertions.[342] The only evidence that Cutrufello applied for seven other positions was his testimony that he applied for every job opening in the TWA system in 1977.[343] The Court finds that Cutrufello did not apply for all ten. Moreover, plaintiff failed to produce evidence that five of the latter seven positions were ever filled.[344]

Plaintiff established to the Court's satisfaction that Cutrufello applied for the remaining twelve of the thirty-nine contested

**337.** Plaintiff claims it introduced 22 acknowledgments corresponding to jobs for which Cutrufello applied, but in fact these documents correspond to only 12 positions still under contention. *See* PX 203, 206, 209, 210, 211, 212, 214, 218, 220, 221, 222, 223, 225, 227, 228, 230, 235. Several of the so-called acknowledgments are actually rejection letters relating to some of the same 12 jobs, *see* PX 211, 212, 223, 230, and others relate to jobs for which plaintiff has not made a claim, *see* PX 205, 207, 208, 213, 216, 219, 226, 231, 232.

**338.** The Ruocco/Wolf investigation of the complaints Cutrufello made to Lauchlan in mid-1977 is further evidence of Cutrufello's lack of credibility on this issue. *See* notes 111–14 *supra* and accompanying text. The Court sees no reason to doubt the good faith of this investigation or the accuracy of its results.

**339.** These include seven Customer Service Agent positions (which are numbered 1 through 5, 8 and 9 in the FACTS section of this Opinion); one FIC position (number 15); four Crew Scheduler positions (numbers 17 through 19 and 22); one Crew Planner position (number 20); one Supervisor position (number 30); two Operational Controller positions (numbers 31 and 32); and one Manager position (number 33).

**340.** Manager, Cargo Customer Services (JFK) (number 33).

**341.** The recipient of Crew Planner/In-Flight Services (JFK) (number 20) was 49 years old, and the recipient of Supervisor, Fleet Services (JFK) (number 30) was approximately 42. In the absence of other highly probative evidence of discrimination, as here, any possible inference of discrimination is negated. *See* note 324 *supra*.

**342.** These include two Customer Service Agent positions (numbers 6 and 7) and the Passenger Service Agent in Charge position (number 14). Cutrufello's testimony with respect to the latter was equivocal, but the Court deems it the equivalent of specific testimony that he applied.

**343.** These include two Supervisor positions (numbers 10 and 11); an FIC position (number 16); two Crew Scheduler positions (numbers 21 and 23); one Analyst position (number 38); and one Ticket Sales Agent position (number 39).

**344.** These include those positions listed in note 343 *supra*, except numbers 21 and 23.

job openings.[345] With respect to two, however, the successful applicants were older than Cutrufello,[346] and a third was cancelled and thus never filled.[347]

■ In summary, therefore, plaintiff did not establish a prima facie case of age discrimination with respect to thirty of the thirty-nine jobs.[348] As to the remaining nine, although plaintiff's evidence of Cutrufello's qualifications was not strong,[349] the Court finds that plaintiff made out a prima facie case. The Court will consider *seriatum* whether defendant articulated a legitimate nondiscriminatory reason for these nine challenged employment decisions.[350]

■ Seven applicants were selected for the position of Supervisor, Customer Services—Ramp (Las Vegas), all of whom were supervisors or group supervisors whose jobs were eliminated in the FORT reorganiza-

tion. As noted previously, all such individuals were assured they would be reassigned within the system. In addition, Cutrufello's employment did not reflect any meaningful management experience, and he was advised by the decision-maker that he was not among the best qualified candidates. Thus, defendant's explanation for Cutrufello's rejection was that in the opinion of the decision-maker those selected were more qualified. Defendant thereby satisfied its intermediate burden to articulate a legitimate reason for the challenged decision.

The Supervisor, Customer Services (Phoenix) position required "strong leadership abilities." Cutrufello's employment records did not evidence any management training or experience, while the selected applicant had held management positions for the seven years prior to his selection. In addition, at the time of selection he was performing

---

**345.** Supervisor, Customer Services—Ramp (Las Vegas) (number 12); Supervisor, Customer Services (Phoenix) (number 13); Quality Assurance Representative (New York City) (number 24); Coordinator, Quality Assurance (Los Angeles) (number 25); Coordinator—Quality Assurance (Kansas City) (number 26); Facilities and Equipment Maintenance Planner (San Francisco) (number 27); Quality Controller (St. Louis) (number 28); Passenger Relations Representative (San Francisco) (number 29); Field Manager (Oklahoma City) (number 34); Field Manager—Ground Services (Phoenix) (number 35); Manager, Cabin Servicing (Los Angeles) (number 36); and Manager, Ramp and Operations (Los Angeles) (number 37).

**346.** The recipient of the Field Manager—Ground Services position (number 35) was 42 years old, and the recipient of the Manager, Cabin Servicing position (number 36) was 47. This evidence negates any possible inference of discrimination. *See* notes 324, 341 *supra.*

**347.** Manager, Ramp and Operations (Los Angeles) (number 37).

**348.** Assuming *arguendo* that plaintiff established a prime facie case as to these 30 positions, the Court finds that defendant successfully rebutted any inference of discrimination by articulating legitimate nondiscriminatory reasons for each of the challenged employment decisions. With respect to those nonmanagement positions which the evidence indicates were filled, 24 of the 28 selected applicants were working in the geographic area where the job was located (numbers 1–9, 15). This reflects TWA's policy to prefer local over non-

local candidates for nonmanagement positions. Moreover, 25 of the 27 applicants selected for the nine Customer Service Agent positions were performing similar if not identical work at the time of selection, and were thus clearly more qualified than Cutrufello. The same is true of the three applicants selected for the Passenger Service Agent in Charge position (number 14). Eighteen of the 30 positions were management positions and Cutrufello's employment records reflected a lack of any significant or meaningful supervisory or management experience. In addition, two positions required knowledge of union contracts or work rules of which Cutrufello's employment records indicated a lack of familiarity (numbers 18, 20). Finally, Cutrufello had limited up-to-date ticketing experience, which many of the positions required (numbers 1–9, 14, 39). In short, although Cutrufello may have possessed the minimum qualifications for many of the jobs, the evidence adduced by defendant established that the successful applicants were in each instance at least as qualified and in most instances more qualified. *See Burdine, supra,* 450 U.S. at 258–59, 101 S.Ct. at 1096–97; *Loeb v. Textron, Inc., supra,* 600 F.2d at 1019. Thus, defendant satisfied its intermediate burden under *Burdine.*

**349.** This is especially true with respect to the seven remaining management positions. The Court finds, however, that Cutrufello possessed sufficient qualifications for these positions to make out a prima facie case.

**350.** These jobs have been previously numbered 12, 13, 24, 25, 26, 27, 28, 29 and 34.

the same functions in Albuquerque as were required in Phoenix. Finally, the recipient received a "5" overall rating in his most recent management performance evaluation. Defendant advised Cutrufello that he was not among the most qualified applicants, which is consistent with the foregoing and satisfies defendant's intermediate burden.

All three recipients of the Quality Assurance Representative (New York City) position were highly recommended for the job, and one had lost his job and not received a Field Manager's position in the FORT reorganization. Cutrufello's employment records reflected a lack of management experience and defendant's records indicate that the decision-maker believed that there were better qualified applicants. This evidence satisfied defendant's burden of articulating a legitimate reason for Cutrufello's rejection.

Defendant's employment records for the Coordinator—Quality Assurance (Los Angeles) position indicate that the decision-maker decided to select applicants for the final round of interviews who appeared "better suited and/or more qualified" than Cutrufello. The recipient had held a management position for the previous three years and received an overall rating of "5" on her most recent management performance evaluation. Defendant also introduced notes of interviews conducted by the decision-maker which clearly indicate that the recipient was selected because she was believed to be better qualified. This is not to say that Cutrufello was not qualified; indeed, his rejection letter stated that he had "many fine qualities which could be well applied." But an employer may select from among qualified candidates, which is what the evidence shows occurred with respect to this position. Thus, defendant satisfied its intermediate burden under *Burdine*.

For the Coordinator—Quality Assurance (Kansas City) position, defendant selected a Customer Service Agent who had held a Quality Controller position in Indianapolis for more than two years. The credible testimony of a TWA personnel administrator established that this experience made the recipient qualified because the contested position was an expanded version of the Quality Controller position. Cutrufello was advised that those interviewed were better qualified than he. Thus, defendant articulated a legitimate reason for this employment decision.

Defendant advised Cutrufello that he was qualified for Facilities and Equipment Maintenance Planner (San Francisco), a nonmanagement position. Nevertheless, it selected a thirty-nine year old Maintenance Coordinating Clerk who had received an excellent appraisal from her supervisor. In addition, the recipient was a member of the local workforce, which defendant preferred for nonmanagement positions. Finally, the interviewer strongly recommended to his superior that she be offered the position, after summarizing the qualifications of all those interviewed. In short, the decision-maker believed that the successful applicant was more qualified than Cutrufello and advised him accordingly. The Court finds that defendant successfully carried its intermediate burden.

Defendant selected from among fifty-nine applicants for the Quality Controller (St. Louis) position. The decision-maker's credible testimony established that the recipient's prior job functions were significantly related to the job functions of the challenged position. Thus, defendant articulated a legitimate nondiscriminatory reason for this employment decision.

The recipient of the nonmanagement position of Passenger Relations Representative (San Francisco) had held the positions of Senior Customer Service Agent and Customer Service Agent for the previous eight years. The credible testimony of a TWA personnel administrator established that the contested position and the positions the recipient had most recently held entailed similar job functions. Moreover, because the recipient was a member of the local workforce, his selection reflected TWA's policy to prefer local candidates. The foregoing satisfied defendant's burden to articulate a legitimate reason for Cutrufello's rejection.

Finally, Cutrufello was not selected for the management position of Field Manager (Oklahoma City). The two successful applicants, one of whom was eight years older than Cutrufello, had both lost their prior positions in the FORT reorganization and were thus guaranteed reassignment. In addition, the Supervisor position that both held was the forerunner of the newly-created Field Manager position, which meant that their experience was both recent and relevant. The foregoing evidence satisfied defendant's intermediate burden under *Burdine*.

Because the evidence with respect to each of these nine employment decisions was sufficient to allow the Court to conclude that defendant "had not been motivated by discriminatory animus," *Burdine, supra*, 450 U.S. at 257, 101 S.Ct. at 1095, defendant articulated legitimate nondiscriminatory reasons in each case and plaintiff was required to prove either directly or indirectly that these reasons were a pretext for discrimination. Plaintiff, however, did not depose or call as witnesses at trial any of the decision-makers to challenge TWA's proffered reasons. Plaintiff certainly did not prove that Cutrufello's qualifications for any of the nine positions were demonstrably superior to the qualifications of the recipients. At most, the evidence established that Cutrufello was qualified for some of the positions. As noted previously, however, an employer is entitled to choose from among several qualified candidates without violating the ADEA.[351]

■ Other evidence adduced at trial is also probative of a lack of pretext. First, Cutrufello received his requested Saudia assignment after he had become a member of the protected age group. In addition, after his furlough, Cutrufello received his full salary for nearly a year. There was no proof that TWA did any less for Cutrufello than it did for other returning Saudia employees or anyone else in a similar position. Indeed, TWA personnel diligently assisted Cutrufello in his efforts to obtain reassignment, which was not guaranteed him by his Saudia contract or TWA policies and procedures. All of the seventeen other employees from Saudia, eight of whom were over forty years of age and seven of whom were older than Cutrufello, obtained reassignment. Rather than establishing pretext, this evidence demonstrates that Cutrufello did not follow constructive advice and was derelict in pursuing reasonable job opportunities. In short, plaintiff failed to carry its burden of proving that defendant intentionally discriminated against Cutrufello or that age was to any extent the basis for the challenged employment decisions.[352]

### George B. Kujawski

■ Because Kujawski's position was eliminated in a reduction-in-force, the elements necessary to establish a prima facie case must be modified to accommodate the fact that Kujawski was not replaced. Thus, plaintiff must prove that Kujawski was (1) in the protected age group, (2) terminated, and (3) qualified to assume another position. Plaintiff must also offer some evidence, direct or circumstantial, from which an inference of discrimination can be drawn. *See Baldwin v. Sears, Roebuck & Co., supra*, 667 F.2d at 462; *Franci v. Avco Corp., supra*, 538 F.Supp. at 256.

Kujawski clearly satisfied the first two elements. As to the third element, because

---

**351.** Plaintiff argues that because some of the recipients of nonmanagement positions were not members of the local workforce, defendant's explanation that Cutrufello was not hired in some cases because he was not a "local" is pretextual. This argument is meritless. First, defendant never claimed that it exclusively hired local candidates for every opening. In addition, the evidence established that 87% of the successful applicants for nonmanagement positions were local candidates. Moreover, TWA's preference for local candidates was not the only reason why Cutrufello was rejected for the various nonmanagement positions. Thus, defendant's proffered explanation in this area was not pretextual.

**352.** The reasons supporting the Court's finding that plaintiff did not prove pretext apply with equal force to the 30 positions for which the Court found that plaintiff did not establish a prima facie case, assuming *arguendo* that plaintiff *did* prove a prima facie case.

the evidence established that Kujawski had long and significant experience in TWA's Cargo Staff department, the Court finds that Kujawski was qualified to hold the position of Manager, Cargo Charter Sales or a related position, assuming such a position became available.

Plaintiff also offered circumstantial evidence that would allow a "reasonable fact-finder to conclude either . . . that defendant consciously refused to consider retaining or relocating [the claimant] because of his age, or . . . that defendant regarded age as a negative factor in such consideration." *Franci v. Avco Corp., supra*, 538 F.Supp. at 256. The Analyst position held by Karen Nielsen, then thirty-four years old, was upgraded to Manager, Cargo Charter Sales, at about the same time that Kujawski was advised that his position would soon be eliminated in a reduction-in-force.[353] Kujawski previously held the same Manager's position. Thus, defendant could, if it so desired, have placed Kujawski in a newly-created Manager's position, while either eliminating Nielsen's Analyst position or continuing her in the same position. From this, an inference sufficient to establish a prima facie case can be drawn that defendant regarded age as a negative factor.

 The foregoing unrebutted circumstantial evidence of discrimination, however, does not by itself sustain plaintiff's ultimate burden of proving intentional discrimination against Kujawski based on age. Indeed, the Court finds that defendant successfully rebutted plaintiff's prima facie case by articulating legitimate nondiscriminatory reasons for terminating Kujawski. The actions taken by defendant in connection with the reduction-in-force that resulted in Kujawski's termination complied in all respects with company policies and procedures. The credible evidence established that when Nielsen's Analyst position was upgraded to Manager, the Analyst position

was eliminated. No new position in the Cargo Charter Sales sub-department was created and, as an upgraded position, the Manager's job was not an opening for which other candidates could apply. The evidence also established that Nielsen's job performance was excellent and justified a promotion. In short, defendant's evidence was sufficient to permit the Court to conclude that defendant was not in fact motivated by discriminatory animus but rather by a legitimate desire to reduce the size of its workforce and to reward Nielsen for her accomplishments. *See Burdine, supra*, 450 U.S. at 257, 101 S.Ct. at 1095.

Plaintiff nevertheless contends that defendant's proffered explanation was a pretext for discrimination, arguing that because defendant intended to create a second position in Cargo Charter Sales, there was actually no net reduction-in-force. In essence, plaintiff argues that defendant would have placed Kujawski in the Manager's position, keeping Nielsen in the Analyst's position, had it not been for Kujawski's age. The Court rejects this contention for several reasons. First, there is no evidence in the record that an additional position was in fact ever created; thus, there *was* a net reduction-in-force. Moreover, when Martin advised Kujawski that his position as Manager, Interline and Intermodal Sales was being eliminated, he offered him another position in the TWA system which may have paid the same salary.[354] Defendant had also given Kujawski a lateral transfer, with no loss in salary, after he was "bumped" from his Manager's position by a more senior employee at the time of the Cargo Staff department reorganization. The Court believes that if defendant intended to discriminate against Kujawski on the basis of his age, it would not have accommodated him in the above manner on two occasions after he passed forty years of

---

353. Kujawski was not actually terminated until January 1978, but both challenged decisions— to eliminate his position and upgrade Nielsen's position—were clearly made at about the same time in November 1977.

354. Plaintiff offered no evidence that the Analyst position Martin offered Kujawski would have paid less than Manager position.

age.[355] In sum, the Court declines to draw the inference suggested by plaintiff; therefore, plaintiff has failed to carry its ultimate burden of persuading the Court that defendant intentionally discriminated against Kujawski.

*Vito A. Angerame*

 Defendant cannot seriously dispute that plaintiff established a prima facie case of age discrimination with respect to Angerame. He was a member of the protected age group when he was terminated and was replaced by a thirty-one year old fellow employee. In addition, Angerame had nearly thirty years of varied TWA experience and recently received excellent management performance ratings from the person who eventually decided to fire him— Adley. The foregoing evidence raises an inference of age discrimination under *Burdine.*

Plaintiff, in turn, cannot seriously dispute that defendant articulated legitimate non-discriminatory reasons for Angerame's discharge: (1) Adley's perception that Angerame engaged in highly inappropriate management tactics in "going over Adley's head" to the latter's supervisor in an attempt to generate blame in other areas to cover up Angerame's own managerial deficiencies; and (2) Angerame's failure to meet sales objectives for 1976. This evidence clearly satisfied defendant's intermediate burden to "produce admissible evidence which would allow the [Court] rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Burdine, supra,* 450 U.S. at 257, 101 S.Ct. at 1095.

Plaintiff argues that the evidence demonstrates that defendant's proffered reasons for the termination were pretext for age discrimination. Plaintiff contends *first,* that there was conflicting evidence as to whether Angerame in fact went over Adley's head in the manner described and that, in any event, it is unlikely this conduct provided the basis for Adley's decision; *second,* that Angerame's failure to meet sales quotas could not have been the basis for Adley's decision because the pertinent reports were not prepared until January or February 1977, two months after Angerame was fired; and *third,* that Angerame was never told that he was fired due to poor sales performance, indicating that this explanation was conceived after the fact and played no part in Adley's decision.

With respect to plaintiff's first argument, the Court finds credible Adley's testimony that he believed Angerame acted in the manner claimed. Thus, even if Adley's perception of what occurred was not entirely accurate,[356] the fact remains that he *believed* it to have occurred and there is no evidence that he somehow concocted the story to mask his decision to fire Angerame because of his age. An employer can terminate an employee for a perceived slight without violating the ADEA, as long as there is no evidence of age animus.

As to plaintiff's second point, there is nothing in the record to indicate that Adley did *not* know of Angerame's failure to meet the sales quotas prior to the end of 1976. Indeed, as Angerame's immediate superior, Adley was probably aware of Angerame's performance on a day-to-day basis. Moreover, Adley testified that Angerame had not met "specific revenue goals on a month-to-month basis" in 1976. This evidence indicates that the actual preparation of the final sales report in 1977 was a formality[357] and that Adley, as Angerame's superior,

---

**355.** There is no evidence that this conduct by defendant was a subterfuge to mask age discrimination.

**356.** There is no evidence other than Angerame's testimony that Adley's perception was inaccurate. In addition, Adley's comment in Angerame's December 1975 management performance evaluation that Angerame "tend[ed] to become impatient when standards are not met and commitments are unsatisfied," PX 253,

is consistent with what Adley claims happened. Angerame's deposition testimony also reflects a somewhat belligerent and uncooperative attitude. *See* PX 243–a.

**357.** The sales report was addressed to and apparently prepared for senior management. *See* PX 250. It was not prepared for Adley, which indicates that Adley already knew its contents.

had contemporaneous knowledge of the sales figures from which the formal report was generated. The Court concludes that plaintiff has not demonstrated pretext on this basis.

Finally, Angerame's testimony that Adley never told him he was fired for poor performance was flatly contradicted by Adley,[358] and the Court credits Adley's testimony. Even if Adley had not so advised Angerame, however, such evidence would not support a finding of pretext. The ADEA does not require that the employee be told of the basis for the employer's decision; it only requires that the decision not be based on age. Here there is no proof that poor performance was not the reason— Angerame in fact acknowledged his failure to meet sales quotas—and there is no proof that Adley conceived the story after the fact to cover up his prior decision to terminate Angerame because of his age. Thus, the Court declines to draw the inference suggested by plaintiff.

There is other evidence supporting the Court's finding that defendant's proffered explanation for terminating Angerame was not a pretext for discrimination. Angerame received three promotions after he reached the age of forty—in 1968 at age forty-one, in 1973 at age forty-six, and in 1975 at age forty-eight. Moreover, Adley apparently did not hold Angerame's age against him when he hired him in 1975 for the position from which he was eventually terminated or when he awarded him an excellent management performance evaluation in December 1975. Most important, Adley testified that age played no factor in any of these employment decisions, and the evidence adduced at trial is consistent therewith. In short, it was Adley's anger at Angerame's going over his head to complain about the performance of others, given Angerame's own less than adequate performance, that provided the impetus for Adley's decision to terminate him. The foregoing conduct did not violate the ADEA.

**358.** *See* note 311 *supra.*

## CONCLUSION

Accordingly, after a nonjury trial on the merits of plaintiff's complaint, the Court finds for defendant.

These are the Court's findings of fact and conclusions of law. Fed.R.Civ.P. 52(a).

SO ORDERED.